Judith B. HOLBROOK, Plaintiff-Respondent,

v.

John S. HOLBROOK, Jr., Defendant-Appellant.†

Court of Appeals

*No. 80–1290. Submitted on briefs April 15, 1981.—
Decided June 4, 1981.*
(Also reported in 309 N.W.2d 343.)

---

[6] *See* sec. 102.23(1)(d)1, Stats.
† Petition to review denied. ABRAHAMSON, J., took no part.

328

For the defendant-appellant the cause was submitted on the briefs of *Harry F. Peck* and *Louise A. Ptacek* of *Petrie, Stocking, Meixner & Zeisig, S.C.,* of Milwaukee.

For the plaintiff-respondent the cause was submitted on the brief of *Burton A. Strnad* of *Strnad & Gossens, S.C.,* of Milwaukee.

Before Decker, C.J., Moser, P.J., and Cannon, J.

MOSER, P.J. This is an appeal from the property division, family support and attorneys' fees awards of the amended divorce judgment dated September 5, 1980. We vacate, in part, the property division and the award of attorneys' fees and remand for further findings consistent with this opinion. We affirm the family support award.

John and Judith Holbrook were married on July 28, 1962, and remained married for eighteen years. At the time of their divorce they had four minor children, ages 16, 14, 11 and 3. Their youngest child is physically disabled due to cerebral palsy. Judith worked as a school teacher for the first two years of the marriage while John attended law school. After John's graduation from law school, Judith did not work outside of the home.

John is currently a partner in the law firm of Quarles & Brady, and, at the time of the divorce, was earning $112,000 per year.

The trial court divided and valued the assets of the parties, as follows:

| Judith: | | |
|---|---|---|
| | Homestead | $152,300 |
| | Household furnishings | $ 15,000 |
| | Checking and Savings Accounts in her name [1] | |
| | 1975 Buick Station Wagon | $ 1,000 |
| | All securities owned by either or both of the parties except the stock in Ashbourne, Ltd. | $ 3,138 |
| | Life insurance policies on her life [2] | |
| | Cash payment | $ 35,000 [3] |
| John: | | |
| | Partnership Interest in Quarles & Brady (capital account value of $23,790 plus "intangible or goodwill value" of $161,330 [4]) | $185,120 |

[1] No value for either Judith's or John's bank accounts was determined by the trial court. The record shows that as of September 26, 1979, Judith had $650 in a checking account and $1,880 in a savings account. There is no way for this court to determine the amounts the parties had in their individual accounts as of September 5, 1980, the date of the amended judgment of divorce. This is a factual determination that should be made on remand by the trial court.

[2] The trial court did not indicate any value for any such policies.

[3] The trial court ordered that as a further division of the estate, John pay Judith $25,000 forthwith and $500 per month for twenty months with nine-percent interest on the remaining balance.

[4] This "goodwill" value was based upon the testimony by Judith's expert witness, Mr. Powers. The valuation process used by Mr. Powers is as follows:

a. "gross income from personal services" is calculated by multiplying billable hours times the hourly billing rate. Mr. Powers used John's total billable hours in 1978, 1,569 hours, and multiplied this by a billing rate of $100 per hour. (There is nothing in the record that indicates that $100 per hour was or is John's billing rate). The total arrived at was $156,900.

b. "contribution to overhead" was computed by multiplying "gross income from personal services" ($156,900) times the reciprocal of the percentage of the law firm's gross income (which is represented by the net income to partners). It was determined that 53.8% of the firm's income was distributed to partners. The

| | |
|---|---|
| 1977 Plymouth Voyager Van | $ 3,000 |
| Checking and savings accounts in his name[5] | |
| Household goods in his possession | $ 2,000 |
| Stock in Ashbourne, Ltd.[6] | |

Additionally, the court valued John's retirement benefits at $12,179, but determined that the benefits accrued to the date of the original decision should be equally divided when John actually receives them, after he retires.

The court found that John's gross income was $112,-000. Judith was awarded custody of the children. The court ordered family support payments to Judith and the children of $60,000 per year, or $5,000 per month (in addition to the cash payment ordered as part of the property division). John was also ordered to pay $1,000 per month for seven months, and $500 in the eighth month immediately following the entry of judgment. This provision appears to have been included to cover Judith's attorneys' fees. The court further ordered that

overhead was therefore determined to be 46.2%. The "contribution to overhead" was calculated as $72,488. ($156,900 × 46.2%).

c. "salary earned from personal efforts" was calculated by subtracting the "contribution to overhead" from the "gross income from personal services:" $156,900 minus $72,488 equals $84,412.

d. "earnings in excess of salary" was calculated by subtracting "salary earned from personal efforts" ($84,412) from gross income for 1978 ($111,000) resulting in $26,588.

e. one-half of "earnings in excess of salary" was subtracted to allow for income taxes, with the rounded result of $13,500.

f. finally, 13,500 was capitalized over twenty years at $5\frac{1}{2}\%$ to get a present value of $161,330.

[5] See note 1, supra.

[6] No valuation of this stock was included in the original findings of fact and conclusions of law or the original judgment nor in either the amended findings of fact and conclusions of law or the amended judgment. According to John's testimony, Ashbourne, Ltd. is a family-owned corporation and the stock has no market value.

John pay Judith for the income taxes payable for the 1980 temporary family support and that the pay for all health care costs for the children.

John makes several claims of error on appeal regarding the valuation and distribution of the marital estate, as well as the family support and attorneys' fees awards. He contends:

1. that the trial court improperly valued:
 a. the homestead,
 b. the automobiles, and
 c. the retirement benefits;
2. that sale of the homestead should have been ordered;
3. that the $60,000 annual maintenance award was excessive;
4. that he should not have been required to contribute to Judith's attorneys' fees;
5. that the trial court erred in finding that John's partnership has a goodwill or intangible value which is a marital asset to be included in the property division; and,
6. that the trial court erred in establishing a goodwill value of $161,300 because the calculation of that figure was based upon an unproven factual assumption.

## VALUATIONS OF HOMESTEAD, AUTOMOBILES AND RETIREMENT BENEFITS

*Homestead*

The trial court found that the homestead, a large brick home on Newton Avenue in Shorewood, Wisconsin, had a value of $152,300, subject to a mortgage of $41,962. John claims that the trial court erroneously valued the homestead as of December 1979, and should have valued it as of the date of the commencement of the trial, September 26, 1979. John's expert testified that on September 26, 1979, the home had a value of $185,000. Judith's expert testified at the December 10, 1979, hearing that he appraised the home in August of 1979, and

estimated its value to be $162,000. He testified also that between August of 1979, and December 1979, the market had changed and the value of the home had fallen by about five percent to seven percent.

Assets of the marital estate are valued as of the date the divorce is granted.[7] This court will not upset the trial court's valuations of assets unless the valuations are against the great weight and clear preponderance of the evidence.[8] Weighing the evidence and determining the credibility of witnesses are matters for the trial court and, where more than one inference can reasonably be drawn from the evidence, we are obliged, on review, to accept the one drawn by the trier of fact.[9]

The divorce in this case was granted orally from the bench on December 10, 1979.[10] It is settled law in Wisconsin that this is the date for determining the value of assets.[11] In the absence of exceptional intervening circumstances,[12] we are not at liberty to conclude that some other date should have been used.

The valuation of assets is a difficult and imprecise obligation of a trial judge in a divorce action. The values of some assets can fluctuate markedly throughout the months of a divorce proceeding and, even on one given date, there may be several conflicting opinions of the

---

[7] *Dean v. Dean,* 87 Wis.2d 854, 871, 275 N.W.2d 902, 909 (1979); *Sholund v. Sholund,* 34 Wis.2d 122, 132, 148 N.W.2d 726, 731 (1967).

[8] *Carty v. Carty,* 87 Wis.2d 759, 765, 275 N.W.2d 888, 890 (1979); *Markham v. Markham,* 65 Wis.2d 735, 741, 223 N.W.2d 616, 619 (1974).

[9] *Markham, supra* note 8, at 741, 223 N.W.2d at 619.

[10] A judgment of divorce is "granted" when it is orally pronounced from the bench. *Holschbach v. Holschbach,* 30 Wis.2d 366, 368–69, 141 N.W.2d 214, 216 (1966).

[11] *See* note 7, *supra.*

[12] *See Sholund, supra* note 7.

value of a certain asset. As the fact finder, it is the trial judge who must draw reasonable inferences and come to reasonable, albeit disputable, conclusions as to the value of assets as of the date the divorce is granted.[13]

■

In this case, the trial court's valuation of the homestead was properly made as of the date the divorce was granted and is not against the great weight and clear preponderance of the evidence.

### Automobiles

We do find error, however, in the valuation of the automobiles. The only testimony in the record regarding the value of the automobiles was John's testimony, based on Bluebook values, that the Buick station wagon was worth $2,795 and the Plymouth van was worth $2,675. There was no other evidence of the value of these automobiles. However, in the amended findings of fact, the trial court valued the Buick station wagon at $1,000 and the Plymouth van at $3,000.

■

A court is not required to adopt uncontradicted testimony if it is inherently improbable.[14] However, "[p]ositive uncontradicted testimony as to the existence of some fact, or the happening of some event, cannot be disregarded by a court or a jury in the absence of something in the case which discredits the same or renders it against reasonable probabilities."[15]

The trial court gave no explanation of its reasons for rejecting the uncontradicted valuations of the automobiles. The failure to set forth its reasoning rendered its analysis of the valuations incomplete, and was an abuse

---

[13] *See* notes 7, 8 and 9, *supra.*

[14] *Kilgust Heating Div. of Wolff, Kubly & Hirsig, Inc. v. Kemp,* 70 Wis.2d 544, 549, 235 N.W.2d 292, 295 (1975).

[15] *Id.* (quoting *Thiel v. Damrau,* 268 Wis. 76, 85, 66 N.W.2d 747, 752 (1954)).

of discretion.[16] Accordingly, we vacate the trial court's valuation of the automobiles and instruct the court on remand to either adopt the uncontradicted values testified to at trial ($2,795 for the Buick station wagon and $2,675 for the van) or to explain what in the case discredited these valuations or rendered them improbable.

### Retirement Benefits

In reference to John's retirement benefits from Quarles & Brady, the amended findings of fact and conclusions of law equivocally state: "That the pension plan of Quarles & Brady and salary continuation program pursuant to the partnership agreement have an aggregate value of $12,179. That said amount does not truly reflect the value of the program." The latter statement apparently refers to the admissions by the expert who valued the plan at $12,179[17] that there were certain

---

[16] See Wisconsin Ass'n of Food Dealers v. City of Madison, 97 Wis.2d 426, 434–35, 293 N.W.2d 540, 545 (1980).

[17] John had two forms of retirement benefits: a basic pension and a supplemental benefit for partners. The total retirement benefits were valued through the use of the following calculation process:

1. Accrued benefits calculated

a. average final compensation $111,176.00
 $\times$ 20% (provided for in the plan) $\times$ .20
 $\times$ accrual fraction $\times$ 15/40
 (number of years employed divided by expected total number of employment years at retirement)

equals accrued basic pension benefit $ 8,338.20.

b. average final compensation $111,176.00
 $\times$ 5% (provided for in the plan) $\times$ .05
 $\times$ accrual fraction $\times$ 8/33
 (number of years as partner divided by expected number of partnership years upon retirement)

equals accrued supplemental benefit $ 1,347.59.

errors made in computing that amount.[18] The court then went on, not to divide the present value of the retire-

2. Present value calculated

a. *basic pension benefit*

| | |
|---|---:|
| accrued benefit | $ 8,338.20 |
| × annuity value | × 8.0353 |
| × survival factor | × .70084 |
| × present value discount | × .23300 |
| present value of basic pension benefit | $ 10,941.00. |

b. *supplemental benefit*

| | |
|---|---:|
| accrued benefit | $ 1,347.59 |
| × annuity value | × 8.0353 |
| × survival factor | × .70084 |
| × discount for withdrawal prior to retirement | × .70 |
| present value of supplemental benefit | $ 1,238.00. |

| | |
|---|---:|
| Total present value of retirement benefits | $ 12,179.00. |

[18] Two errors were made in this calculation and were disclosed in the record: first, the basic pension benefit plan contained a provision limiting the "average final compensation" amount to $100,000 (this limit does not apply to the supplemental benefits); and second, the retirement plan applicable to John excluded the first five years of employment so that the "accrual fraction" for the basic benefit would be 10/35, rather than 10/40. Correcting for both of these errors, the present value for the benefits would be:

*basic pension*

| | |
|---:|---:|
| $100,000 | |
| × .20 | |
| × 15/35 | |
| $ 5,714.00 | |
| × 8.0353 | |
| × .70084 | |
| × .23300 | |
| $ 7,498.00 | |

ment benefits, but to order that when they become due "[t]he proceeds shall be divided equally between the parties based upon the pension benefits accrued as of the date of the original Decision in this action."

John contends on appeal that the court was obligated to distribute the present value of the benefits at the time of the divorce and that it was error for the trial court to postpone, for at least twenty-five years, the division of the retirement benefits.

In *Bloomer v. Bloomer*[19] our supreme court recognized that the valuation and division of pension rights is a matter for the trial court's discretion.[20] The court explained that there are at least three ways that pension rights can be valued and divided:

*supplemental benefits*

$111,176.00
× .05
× 8/33

---

$ 1,348.00 (rounded)
× 8.0353
× .70084
× .2330
× .70

---

$ 1,238.00
Total = $8,736.

On remand, should the trial court decide to presently divide the pension benefits, it must adjust the present value amount of these benefits as indicated above to account for the undisputed errors in computation used to arrive at the $12,179 figure. However, the trial court is not bound by the recalculation set out above to the extent that it deems it proper to accept John's argument that the "final compensation" figure used to begin the calculations should be the actual income average for the five years preceding the divorce rather than using the then-current year's compensation or the $100,000 maximum.

[19] 84 Wis.2d 124, 267 N.W.2d 235 (1978).

[20] *See id.* at 134, 267 N.W.2d at 240.

1. the trial court may determine the amount of the employee-spouse's contribution to the fund, plus interest, and award the other spouse an appropriate share;
2. the court may award the nonemployee-spouse a share of the present value of the employee-spouse's retirement benefits when they vest under the plan. In addition to discounting to present value, further discounting should be made to account for the probability of death before qualification for benefits and for vesting. Consideration should also be given to the employee-spouse's life expectancy as a retiree. This approach may be too speculative in some situations;[21]
3. the trial court may determine a fixed percentage of any future payments under the employee-spouse's pension plan attributable to earnings during marriage to which the nonemployee-spouse is entitled.[22] This requires no calculation of present value. This method is best where present value of a pension fund is difficult or impossible to assess.[23]

Which, if any, of these methods is appropriate is a discretionary decision dependent "upon the circumstances of the case, the status of the parties, and whether the result is a reasonable valuation of the marital asset."[24]

Although it was a discretionary matter for the trial court to determine which valuation and division method should be used, the record does not show why the court determined a present value for the pension plan[25] and then ordered a future division of the payments as they become due.

Appellate review of discretionary decisions is virtually impossible where there is no record of the trial court's

[21] *See id.* at 135, 267 N.W.2d at 241.

[22] *See id.* at 136, 267 N.W.2d at 241.

[23] *Selchert v. Selchert,* 90 Wis.2d 1, 11–12, 280 N.W.2d 293, 298 (Ct. App. 1979).

[24] *Bloomer, supra* note 19, at 135, 267 N.W.2d at 240–41.

[25] *See notes* 17 and 18, *supra.*

reasoning in reaching a particular conclusion. Our supreme court has explained that the exercise of discretion is more than simply making a decision: it requires a reasoning process dependent upon facts in, or reasonable inferences from, the record and a conclusion based on proper legal standards.[26] "There should be evidence in the record that discretion was in fact exercised and the basis of that exercise of discretion should be set forth."[27] The failure to set forth the reasoning used to reach a decision is an abuse of discretion.[28]

In deciding which method of dividing the retirement benefits should be adopted in this case, the trial court should consider the advantages and disadvantages of the various methods. We believe that a trial court should be particularly alert to the advantages of dividing retirement benefits at the time of divorce rather than postponing the actual division for a number of years until the employee-spouse actually retires. Determining the present value of retirement benefits is admittedly speculative, but this is true of valuation of any asset. We believe that where there are sufficient assets available at the time of divorce to divide the present value of the retirement benefit without causing an undue hardship on either spouse, this method is preferred. This method is especially preferred where, as here, there is uncontradicted expert testimony on valuation.

Although the future division method adopted by the trial court in this case is an acceptable method of divi-

[26] *McCleary v. State*, 49 Wis.2d 263, 277, 182 N.W.2d 512, 519 (1971); *see also D.H. v. State*, 76 Wis.2d 286, 310, 251 N.W.2d 196, 205 (1977); *State v. Hutnik*, 39 Wis.2d 754, 764, 159 N.W.2d 733, 737–38 (1968).
[27] *McCleary, supra* note 26, at 277, 182 N.W.2d at 519.
[28] *Id.* at 277–78, 182 N.W.2d at 520.

sion, we believe that it should only be used where the record shows that present value determinations are unacceptably speculative or where there are not enough assets to equitably require that benefits due in the future be split presently.

In this case, the method of computing the present value of the retirement benefits was undisputed (although the actual computation contained errors which are corrected in our footnote 18). The court indicated no reasons for rejecting this method and for opting for the less preferred future division method. Accordingly, on remand we instruct the trial court to either adopt the present value method or to set forth its reasoning, under the facts and circumstances of this case, for delaying the division until some undetermined future date.

## SALE OF THE HOMESTEAD

John contends on appeal that in order to accomplish an equitable division of the marital estate, the homestead should be sold and the proceeds divided. We think the conclusion that Judith and the children should be permitted to remain in the home is reasonable. The amount of equity the Holbrooks have in the home, the costs and disruption of moving, the age of the children, and the current cost of financing a new home are factors which support the trial court's conclusion. There is also a statutory preference for this result.[29] How Judith allocates the funds provided by the property division and family support to cover the upkeep of the home should be left to her.

[29] Sec. 767.255(7) (formerly sec. 247.255(7)), Stats.

## FAMILY SUPPORT

Judith was awarded $60,000 per year for family support. John contends that this is excessive. We do not believe that the family support award is unreasonable under the circumstances in this case.

Family support is to be determined by assessing the family's need and the paying spouse's ability to pay.[30] We think both considerations support the award in this case.

Judith has the responsibility of feeding, clothing and generally caring for four minor children, one of whom is, at least to some extent, physically disabled by cerebral palsy. The record also shows that Judith is disabled by an ankle injury which makes her unable to work. In contrast, John is a partner in a large and reputable law firm where he is earning $112,000 a year.

The trial court indicated its reasons for awarding $60,000 in family support in its memorandum decision written in response to a motion to amend the original findings of fact and conclusions of law and the original judgment. The court indicated that it had reexamined the award and declined to change its determination that the amount was fair and reasonable. The court determined that, although two of the children were approaching the age of majority, the award should not be changed and when the childen do reach majority, John can bring a motion for reduction of family support based on the change of circumstances.

The memorandum decision and the findings of fact and conclusions of law indicate that the trial court exercised its discretion based upon proper factors and set forth at least some of its reasoning in the record. We

[30] *See Czaicki v. Czaicki*, 73 Wis.2d 9, 18, 242 N.W.2d 214, 218 (1976).

find no abuse of discretion and therefore defer to the trial court's judgment.

## ATTORNEYS' FEES

Originally, John was ordered to pay $15,000 toward Judith's attorneys' fees. On reconsideration of this issue, the court stated:

The court has again reviewed the file and determines that that would be the amount of [Judith's attorneys'] total fee and agrees with counsel for the defendant that to require defendant to pay the total fee would be unfair. Therefore the court sets as a reasonable contribution, under *Anderson v. Anderson,* 72 Wis.2d 631, the sum of $7,500 to be paid in the manner described earlier.

The court further finds that there is a demonstrated need for the plaintiff to receive this assistance by way of a contribution and further there is a demonstated ability on behalf of the defendant to pay the same, and that the sum fixed by the court is a fair and reasonable sum.

Before awarding attorney's fees, the trial court is required to make the following factual determinations:

1. the spouse receiving the award needs the contribution;
2. the spouse ordered to pay has the ability to do so; and,
3. the total fee is reasonable (this provides guidance in determining what is a reasonable contribution).[31]

John disputes the trial court's determination that Judith needed the contribution to her attorneys' fees. We do not believe that the trial court's finding of need was against the great weight and clear preponderance of the evidence.

---

[31] *Selchert, supra* note 23, at 15–16, 280 N.W.2d at 300 (Ct. App. 1979); *see also Anderson v. Anderson,* 72 Wis.2d 631, 646, 242 N.W.2d 165, 172 (1976).

However, we must, nonetheless, remand the issue to the trial court for a determination of the amount of Judith's total attorneys' fees and the reasonableness of that amount. "In the absence of some indication as to what the total fee is, this court is left to surmise as to whether the proper balance was struck between the former wife's needs and the divorced husband's ability to pay."[32] This requirement is not satisfied by the trial court's determination that $7,500 was a *reasonable contribution*. It must first be determined what the total fee actually is and whether it is reasonable. Without this determination, we cannot review the reasonableness of the contribution.

## INCLUSION OF GOODWILL AS AN ASSET

The major dispute in this appeal focuses on the trial court's determination that the goodwill or intangible value of John's partnership interest in Quarles & Brady is a marital asset which must be considered in the property division. John also disputes the court's determination that this asset had a value of $161,300.[33] He claims

---

[32] *Anderson, supra* note 31, at 646, 242 N.W.2d at 173. Although the court stated in the above quoted excerpt from its memorandum decision that the original award of $15,000 would cover Judith's attorneys' total fee, we find no indication from the record of the actual amount of attorneys' fees owed. In the trial brief, Judith's attorneys state that Judith "incurred substantial expense in the litigation of this matter" due to the use of many experts, the custody dispute, various motions, depositions and conferences with doctors and experts. It was asserted that many hours were spent preparing for trial. In conclusion it was asserted that "a reasonable contribution towards attorneys' fees and expert witness fees would be $13,500.00." It is not at all clear if that was meant to be a statement of what the total fee was. If so, we are at a loss to determine where the court arrived at its original $15,000 figure.

[33] *See* note 4, *supra.*

that the method of calculating this value was based on completely unsupported factual assumptions, specifically, the assumption of a $100 per hour billing rate.

John contends that the intangible or goodwill value of the partnership is not an asset or any kind of property. He argues that the only property interest in the partnership consists of his "capital account" of $23,790.36, the contractually determined, fixed amount payable to him upon withdrawal from the firm.

We conclude that the trial court erred in determining that the marital estate included the goodwill value of John's partnership. We therefore do not address the issue of the method of valuation.

*Defining the Concept*

Goodwill has been defined thusly:

[T]he advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partiality or prejudices.[34]

The favor which the management of a business wins from the public . . . . The fixed and favorable consideration of customers arising from established and well-conducted business . . . . The favorable consideration shown by the purchasing public to goods known to emanate from a particular source . . . . Something in business which gives reasonable expectancy of preference in race of competition.[35]

[34] 38 Am. Jur.2d, *Goodwill* §1 (1968); *see* J. Story, Commentaries on the Law of Partnerships §99 at 170 (6th ed. J. Gray, ed., 1868).

[35] Black's Law Dictionary 625 (5th ed. 1979) [citations omitted.]

Originally, goodwill was said to exist only in commercial business, and not in a professional business which depends upon the skill and reputation of a particular person.[36]

Because goodwill has no existence apart from the business to which it attaches, courts have determined that there can be no income tax deduction for loss of goodwill;[37] the loss of goodwill cannot be compensated for in eminent domain proceedings;[38] goodwill cannot be used to satisfy debts;[39] nor is it subject to depreciation.[40]

In an article criticizing the rather unstable and inconsistent development of the concept of professional goodwill in marital dissolutions in California, Ira Lurvey points out that some view goodwill as something that can only be ascertained upon the actual sale of a business.[41] However, "[s]uch protection of the real marketplace is missing . . . from the *hypothetical* sale ordered on dissolution of marriage. There is neither a real buyer nor a real seller."[42] Mr. Lurvey asserts that in light of this and the other attributes of goodwill discussed above it is:

at least arguable that "goodwill," by whatever name designated, is only an entry in an accounting statement arrived at by hindsight to accommodate any amount paid or received on transfer of a going business beyond the value attributable to its tangible assets.

---

[36] 38 Am. Jur.2d, *Goodwill* §8 (1968); Lurvey, *Professional Goodwill on Marital Dissolution: Is It Property or Another Name for Alimony?* Jan./Feb. 1977 Cal. State Bar J. 27, 29 (hereinafter Lurvey).

[37] Lurvey, *supra* note 36, at 29 citing *Red Wing Malting Co. v. Willcuts*, 15 F.2d 626, 633 (8th Cir. 1926).

[38] *Id.* citing *inter alia* 27 Am. Jur.2d, *Eminent Domain* §287.

[39] *Id.* citing *Lilienthal v. Drucklieb*, 84 F. 918, 918–19 (C.C.N.Y. 1898).

[40] *Id.* citing *Red Wing Malting Co. v. Willcuts*, 15 F.2d 626, 629, 632–34 (8th Cir. 1926).

[41] *Id.* at 30.

[42] *Id.* [Footnote omitted, emphasis in original.]

Thus at best "goodwill" is intangible.

It is also amorphous, ephemeral, elusive; and, by general definition, speculative and uncertain except to the extent that it has already been established by an arms-length bargaining in the open market place.[43]

*Professional Goodwill as a Marital Asset in Other Jurisdictions*

With an apparent lack of deliberativeness, the California courts have developed the view that the goodwill of a professional practice is an asset which must be accounted for upon dissolution of a marriage.[44] However, the cases are inconsistent in their treatment of goodwill. It is not clear whether it is truly a separate asset to be valued and divided,[45] or whether it is actually "the vehicle whereby the *established employment or earning capacity of the husband,* which often 'constitutes the most valuable economic asset of the parties,' was divided as community property."[46] The California position is further obscured by the determination in one case involving the dissolution of a law partnership and not a divorce, in which it was ruled that goodwill cannot be divided between partners when a law partnership is dissolved because it had attached to the individual partners, had no monetary value, and could not be sold.[47] Subsequently, in the first California divorce case involving the issue of goodwill in which the husband-professional was not a

[43] *Id.*

[44] *Id.* at 30, 78–83.· *Golden v. Golden,* 270 Cal. App.2d 401, 404–05, 75 Cal. Rptr. 735, 737–38 (1969) is often cited as the leading case for this rule. *Golden* involved a medical practice in which the husband was a sole practitioner.

[45] *See Todd v. Todd,* 272 Cal. App2d 786, 792–93, 78 Cal. Rptr. 131, 135–36 (1969).

[46] *Lurvey, supra* note 36, at 82 [emphasis in original] quoting *In re Marriage of Rosan,* 24 Cal. App.3d 885, 898, 101 Cal. Rptr. 295, 304 (1972).

[47] *Lyon v. Lyon,* 246 Cal. App.2d 519, 54 Cal. Rptr. 829, 833 (1966).

sole practitioner, but a partner,[48] the court stated that the existence and value of goodwill must be determined regardless of "whether related to that of a sole practitioner, a professional partnership or a professional corporation."[49]

The California rule has been adopted in Washington.[50]

The California approach has been deservedly criticized as a "confusion of rules and methods of valuation, compounded by inconsistencies in logic and application and conceptual problems over possible duplication of spousal support and denial of equal protection."[51]

An equally criticizable and anomalous situation exists in Texas where the inclusion of professional goodwill as an asset in the marital estate is dependent upon whether the professional involved is a sole practitioner or a member of a professional partnership or corporation.

*Nail v. Nail*[52] involved an opthalmologist who had established a sole medical practice. The Texas Supreme

[48] *In re Marriage of Lopez*, 38 Cal. App.3d 93, 113 Cal. Rptr. 58 (1974).

[49] *Id.* at 109, 113 Cal. Rptr. at 68; *see* Adams, *Professional Goodwill as Community Property: How Should Idaho Rule?*, 14 Idaho L. Rev. 473 (1978).

[50] *See In re Marriage of Lukens*, 16 Wash. App. 481, 558 P.2d 279 (1976). This case conflicts with the early Washington case of *Lockhart v. Lockhart*, 145 Wash. 210, 259 P. 385 (1927), in which the court, although recognizing the existence of goodwill in a professional business, ruled that upon divorce a wife is not entitled to a portion of its value because goodwill attached to the husband and could be abandoned at any time. *Id.* at 213, 259 P. at 387; Adams, *supra* note 49, at 479.

[51] Lurevy, *supra* note 36, at 85. To the extent that the recognition of goodwill in divorce is really an effort to divide "the value that had accrued during the marriage to the establishment of the husband's career, in whatever field, and his resultant income," the equal protection question arises: Is it not an arbitrary and capricious distinction to apply the doctrine only to professional spouses, individually or as partners, but not to salaried employees? *Id.* at 84.

[52] 486 S.W.2d 761 (Tex. 1972).

Court determined that the goodwill of a sole practitioner's business does not possess value or constitute an asset separate from the individual and his ability to continue practicing and would cease to exist if the individual withdrew from the business.[53] Accordingly, the supreme court determined that the wife's community interest in the medical business did not extend to the enhanced value attributable to goodwill. This enhanced value, the court said, was merely an expectancy completely contingent on the continuation of existing circumstances and therefore was not a vested property right subject to division upon divorce.[54]

However, in *Geesbreght v. Geesbreght*[55] the court of civil appeals determined that goodwill may exist as an asset of a professional partnership or corporation separate from any individual member. That case involved a multi-member medical corporation, which the court said could acquire its own reputation or goodwill, despite changes in personnel. Hence, the goodwill of the corporation should be accounted for in evaluating the practitioner's interest in the business.[56]

The inconsistencies and inequity of the distinctions of *Nail* and *Geesbreght* have been noted and criticized.[57]

Even greater problems arise when, after it has been determined that professional goodwill is a marital asset divisible upon divorce, attempts are made to place a dollar value on the goodwill that is part of the marital estate. This would be especially problematic, where, as here, the business involved has several members, all of whom have presumably contributed to the goodwill of the business. Valuation of one individual's goodwill interest in the business would be almost pure speculation.

[53] *Id.* at 764.
[54] *Id.*
[55] 570 S.W.2d 427 (Tex. Civ. App. 1978) *writ dismissed.*
[56] *Id.* at 436.
[57] Note, 11 St. Mary's L.J. 222 (1979).

*Professional Goodwill in Wisconsin*

We are not persuaded that the concept of professional goodwill as a divisible marital asset should be adopted in Wisconsin. We are not obliged nor inclined to follow the twisted and illogical path that other jurisdictions have made in dealing with this concept in the context of divorce.

The concept of professional goodwill evanesces when one attempts to distinguish it from future earning capacity. Although a professional business's good reputation, which is essentially what its goodwill consists of, is certainly a thing of value, we do not believe that it bestows on those who have an ownership interest in the business, an actual, separate property interest. The reputation of a law firm or some other professional business is valuable to its individual owners to the extent that it assures continued substantial earnings in the future. It cannot be separately sold or pledged by the individual owners. The goodwill or reputation of such a business accrues to the benefit of the owners only through increased salary.

We think this case is analogous to the situation in *DeWitt v. DeWitt*[58] in which this court determined that a professional education or the increased earning capacity that it confers upon the spouse who holds it is not a divisible marital asset, even though the acquisition of the degree is partly attributable to the earnings and efforts of the other spouse. This court quoted, with approval, the reasoning of *In re Marriage of Graham:*[59]

An educational degree . . . is simply not encompassed even by the broad views of the concept of "property." It does not have an exchange value or any objective transferable value on an open market. It is personal to the holder. It terminates on death of the holder and is not inheritable. It cannot be assigned, sold, transferred,

---

[58] 98 Wis.2d 44, 53–54, 296 N.W.2d 761, 766 (Ct. App. 1980).
[59] 194 Colo. 429, 574 P.2d 75, 77 (1978).

conveyed, or pledged. An advanced degree is a cumulative product of many years of previous education, combined with diligence and hard work. It may not be acquired by the mere expenditure of money. It is simply an intellectual achievement that may potentially assist in the future acquisition of property. In our view, it has none of the attributes of property in the usual sense of that term.

It was further explained in *DeWitt* that valuing a professional degree as a marital asset necessarily requires division of the post-divorce earnings of the degree-holding spouse, which is inconsistent with the requirement that only assets acquired during marriage can be divided.[60]

Like an educational degree, a partner's theoretical share of a law firm's goodwill cannot be exchanged on an open market: it cannot be assigned, sold, transferred, conveyed or pledged. Although we recognize the factual distinction between a degree-holder and a partner or shareholder in a law firm, we think the similarities compel analogous treatment in a divorce setting. In both cases, the "asset" involved is not salable[61] and has computable value to the individual only to the extent that it promises increased future earnings.

There is a disturbing inequity in compelling a professional practitioner to pay a spouse a share of intangible assets at a judicially determined value that could not be realized by a sale or another method of liquidating value.[62]

---

[60] *DeWitt, supra* note 58, at 54, 296 N.W.2d at 766.

[61] In contrast, a commercial business, including any goodwill value, is salable. We do not think the same inequities arise when the goodwill value of a commercial business is included in the assessment of the total worth of the business for purposes of property division. *See Spheeris v. Spheeris*, 37 Wis.2d 497, 504–07, 155 N.W.2d 130, 134–36 (1967).

[62] *See* Note, 11 St. Mary's L.J. 222, 230 (1979).

There is no dispute in this case that upon withdrawal from the partnership, John would be entitled to receive only his capital account value of $23,790. Ethically and contractually, he is prevented from otherwise disposing of his interest in Quarles & Brady. The capital account value is the only value that should have been assigned to his partnership as an asset.

As stated earlier, the goodwill or reputation of Quarles & Brady is reflected in John's substantial salary. This salary was considered in setting the family support award. To also treat the goodwill of the law firm as a separate divisible asset, would constitute double counting.[63] The fact that John is a partner in a reputable law firm is, however, a proper factor to consider in dividing the assets, as well as determining the amount of family support.[64] If circumstances warrant future amendment of the family support award, this may be done.[65] We think that this is a more direct and reasonable way of accounting for John's professional position.

Judith's contribution to the furtherance of John's legal career is reflected in the home, furnishings and other tangible assets that the family has acquired over the years. Indeed, she was awarded a great deal of these family assets in the divorce.

Accordingly, we vacate the trial court's valuation of John's partnership to include goodwill and order on remand that the undisputed value of $23,790 be assigned to that property.

---

[63] *See Kronforst v. Kronforst,* 21 Wis.2d 54, 63–64, 123 N.W.2d 528–534 (1963) in which the supreme court found that it was error to include a profit-sharing trust as an asset for property division purposes and then also as an income source to be considered in awarding alimony. The same rule was applied in *Johnson v. Johnson,* 78 Wis.2d 137, 143, 254 N.W.2d 198, 201–02 (1977) to the accounts receivable of a medical business.

[64] *See* secs. 767.255(6) (previously 247.255(6)) and 767.26(5) (previously 247.26(1)(e)), Stats.

[65] *See* sec. 767.32(1) (previously 247.32(1)), Stats.

*By the Court.*—That part of the judgment regarding the family support award is affirmed; the valuation and disposition of the homestead are also affirmed. The remainder of the property division section of the judgment is vacated and the matter remanded for further findings consistent with this opinion with regard to the following items: the valuation of the automobiles, the valuation of the retirement benefits, the valuation of the parties' individual bank accounts, the valuation of the stock in Ashbourne, Ltd., and the valuation of John's partnership interest at Quarles & Brady. The portion of the judgment granting the award of attorneys' fees is vacated and remanded for further findings consistent with this opinion. The trial court is instructed to reconsider the division of the assets after these findings are made.