IN RE the MARRIAGE OF: Jordan LEWIS, Petitioner-Respondent and Cross-Appellant,

v.

Sandra LEWIS, Respondent-Appellant and Cross-Respondent.

Court of Appeals

No. 82–1240. *Submitted on briefs February 24, 1983.—Decided May 11, 1983.*
(Also reported in 336 N.W.2d 171.)

---

[4] We reject Quale's assertion that Kohlmetz' appeal is frivolous.

For the petitioner-respondent and cross-appellant the cause was submitted on the brief of *Harold A. Laufer* of *Rubin & Laufer, S.C.* of Milwaukee.

For the respondent-appellant and cross-respondent the cause was submitted on the brief of *Robert E. Cook* of *Cook & Franke, S.C.* of Milwaukee.

Before Scott, C.J., Voss, P.J., and Brown, J.

SCOTT, C.J. Sandra Lewis, the respondent in a divorce action, appeals from the trial court's valuation of her husband's partnership interest in a boarding kennel and his interest in an animal hospital. Mrs. Lewis also appeals the amount of her maintenance award. Dr. Jordan Lewis cross-appeals from that part of the divorce judgment ordering him to pay $1,000 towards Mrs. Lewis' attorney fees. The issues are whether the trial court properly applied the professional goodwill exclusion set forth by *Holbrook v. Holbrook*, 103 Wis. 2d 327, 309 N.W.2d 343 (Ct. App. 1981), in valuing Dr. Lewis' partnership interests and whether the trial court abused its discretion in determining maintenance or ordering a contribution towards attorney fees. Because we conclude that the trial court misapplied the *Holbrook* exclusion and made insufficient findings on the other matters, we reverse and remand for further proceedings not inconsistent with this opinion.

At the time of their divorce hearing, the Lewises had been married for twenty-six years. Sandra was forty-nine years old, and Jordan was fifty-five. During the marriage, Sandra raised two children, now adults, and worked some of the time as a receptionist. Throughout the marriage, Jordan worked as a veterinarian. For a substantial period, he has operated an animal clinic in partnership with his brother, also a veterinarian. Under a separate partnership, the brothers own and operate a boarding kennel.

Sandra has lived apart from Jordan since 1977. On the hearing date, she was employed as an artist's representative. Her earnings for 1981 were less than $3,000. She also received a voluntary payment of $2,400 from Jordan. Sandra submitted a monthly budget of $593. Her expenses included $300 for a heated apartment and $60 for food. She testified that she was about to undertake a two and one-half year course of study that would prepare her to work with children who have learning disabilities.

Jordan has continued to occupy the marital homestead. His gross income for 1981 was approximately $49,400. He submitted a monthly budget of $2,919.75. His expenses included $408 for housing costs, $150 for food and $555.25 for insurance on his car, his life and the life of his brother.

The Lewis Boarding Kennel houses the pets of vacationers. The Lewis brothers own the business as equal partners and do all of the work necessary for its operation. Partnership assets include an eighty-foot kennel building and the one-half acre lot on which the building is situated. Jordan stated that a recent appraisal fixed the value of the lot at $28,000. The assessor for the Village of Menomonee Falls testified that the fair market value of the real estate and kennel was $56,200.

Joseph Tierney, an accountant and attorney, testified that the value of Jordan's interest in the kennel operation was approximately $2,438. Tierney based his valuation, in part, on the $5,752 book value of the business (an amount that included the cost of the kennel building, less accumulated depreciation). Tierney stated that the book value had no relationship to the market value of physical assets belonging to the business. Tierney also based his valuation on an analysis of the kennel's earnings. The net income from the kennel in 1981 was $12,180. Tierney calculated, however, that only $920 of the $6,090 that Jordan received from the kennel business in 1981 was properly attributable to Jordan's partnership interest in the business.[1] Averaging book value with the value of

[1] Tierney's analysis was aimed at determining the value of Jordan's partnership interest to an outside investor who would neither directly participate in the operation nor liquidate its assets. To calculate the profit that such an outsider would make were he to purchase Jordan's interest, Tierney first theorized that had the Lewis brothers not run the kennel themselves in 1981, they would have had to pay someone $8,500 to run the operation. Tierney then deducted $8,500 from the kennel's 1981 net income of $12,180 and

partnership earnings, Tierney concluded that the entire kennel partnership was worth $4,876.

The Lewis brothers are equal partners in the Lewis Animal Hospital, a veterinary clinic consisting of a waiting room, two examining rooms, a patient ward and an X-ray room. The clinic building is connected to a residence owned and occupied by Jordan's brother. The brother also owns the land on which the clinic is situated.

The partnership agreement for the Lewis Animal Hospital includes a cross-purchase agreement stating that:

> Upon the death, disability, or retirement after age sixty (60) of a Partner, such Partner or his estate . . . shall sell, and the remaining Partner shall purchase, all of the Selling Partner's interest in the Partnership at a purchase price equal to one-half (½) of the Net Going-Concern Value of the Partnership . . . .

The agreement defines "Net Going-Concern Value" as "an amount equal to the net book value of the Partnership . . . plus an amount equal to the gross receipts of the Partnership . . . for the taxable year immediately preceding the year in which the event giving rise to the determination of Net Going-Concern Value occurs." The partnership agreement requires each brother to maintain sufficient insurance on the life of the other so that either would be able to purchase one-half of the partnership from the other's estate. The gross receipts for the Lewis Animal Hospital in 1981 were $126,786.

---

deducted federal and state taxes from the remainder. Tierney designated one-half of what was left, $920, as profit attributable to Jordan's partnership interest.

Tierney's conclusion that the entire kennel partnership was worth $3,876 ignored partnership real estate that Jordan, himself, testified was worth $28,000. As we have noted later in this opinion, a more equitable approach to the valuation of an ongoing professional partnership begins by asking what the partner in question would receive were he to withdraw from the partnership or were the partnership to be dissolved.

Accountant Tierney testified that the total value of Jordan's partnership interest in the clinic was $750. As in the case of the kennel partnership, Tierney based his valuation on the book value of the clinic partnership's assets, $3,000, and on an analysis of the clinic's earnings. The clinic's net income in 1981 amounted to $85,490. Tierney calculated, however, that partnership earnings for the year were zero.[2] Averaging book value with partnership earnings, Tierney concluded that the value of the whole clinic partnership was $1,500.

The trial court treated both the kennel and the animal clinic as belonging to a single professional partnership. The court made no comment on the value of partnership real and personal assets. It stated that the formula set out in the cross-purchase agreement for fixing the purchase price of one partner's interest in the animal clinic "may be a formula freely and voluntarily arrived at between partners for determining the dissolution of the partnership." The court viewed the formula, however, as a means of placing a value on the clinic's goodwill and concluded that under *Holbrook*, it was required to exclude Jordan's professional goodwill from the marital property. The court then determined that Jordan's share of the kennel partnership was worth $2,438 and his share of the clinic was worth $750. The court found that the total marital estate was worth $163,761 and awarded $81,880 to Sandra. Without mentioning any of the factors enumerated in sec. 767.26, Stats., the court awarded Sandra maintenance of $200 per month for thirty-six months. Further, the court summarily ordered Jordan to pay $1,000 towards Sandra's attorney fees.

Placing an approximate value on an interest in a professional partnership when the partner whose interest is

---

[2] Tierney deducted hypothetical salaries for two veterinarians and a clerk from the clinic's net income of $85,490 and concluded that an outside investor would make no profit from the operation.

in question intends to continue as a member of the partnership is bound to be somewhat speculative. Circumstances preclude direct resort to fair market value, the usual method of valuing property for the purposes of divorce. *See Corliss v. Corliss,* 107 Wis. 2d 338, 345, 320 N.W.2d 219, 222 (Ct. App. 1982). The general view is that valuation of a partner's interest for the purpose of dividing marital property should be approached in the same manner as valuation of a withdrawing partner's interest or the interest of a partner on dissolution of the partnership. *See In re Marriage of Wilson,* 443 N.E.2d 31, 35 (Ill. Ct. App. 1982) ; *Johnson v. Johnson,* 277 N.W.2d 208, 213 (Minn. 1979) ; *Stern v. Stern,* 331 A.2d 257, 260 (N.J. 1975).

The Minnesota Supreme Court has described the general partnership valuation process as follows:

First, the difference between the fair market value of the partnership's assets, both real and personal, and its liabilities is determined. Next, the partners' capital accounts . . . are subtracted from that figure. Out of the remainder, the partner's percentage interest is determined. The partner's capital account in full is an additional, separate asset to be included in the division of property.

*Johnson,* 277 N.W.2d at 213. Where the partnership articles include a formula for calculating payment to a withdrawing partner, the New Jersey Supreme Court has suggested that a trial court might treat that amount as the presumptive value of a partner's interest, subject to the challenge that the figure does not reflect true value. *Stern,* 331 A.2d at 260–61.

Our analysis in *Holbrook* is consistent with the general view that valuation of one partner's interest in an ongoing professional partnership should focus on the monetary consequences if that partner were to withdraw from the business. In *Holbrook,* the husband appealed from a

trial court determination that his partnership interest in a large law firm was worth $23,790, the amount of his capital account, plus $161,330, the value that the trial court assigned to the husband's share of his firm's goodwill. This court noted that while the goodwill of a commercial business is salable, "a partner's theoretical share of a law firm's goodwill cannot be exchanged on an open market." *Holbrook,* 103 Wis. 2d at 351, 309 N.W.2d at 355. We held that professional goodwill is not divisible as a marital asset where the value of the goodwill can only be set by judicial determination and can never be "realized by a sale or another method of liquidating value." *Id.* We concluded that only the value of the husband's capital account, a sum that he would receive pursuant to the partnership agreement were he to leave the firm, should have been assigned as a marital asset. *Id.* at 352, 309 N.W.2d at 355.

The first issue on appeal is whether the trial court erred in its application of *Holbrook* to valuation of the veterinarian husband's partnership interests. We conclude that because the boarding kennel is a commercial business, it is not subject to *Holbrook.* Further, we conclude that *Holbrook* does not bar a trial court from considering a cross-purchase formula in a partnership agreement as evidence of the value that should be assigned to a partner's interest for the purpose of determining the marital estate.

■

The trial court erred in defining the kennel operation as a professional partnership simply because the owners of the business are veterinarians. Pet boarding is a commercial enterprise, regardless of the partners' professional degrees. We remand to the trial court for valuation of the kennel partnership as a commercial business. The trial court should make findings concerning the fair market value of the partnership's real and personal as-

sets, partnership liabilities and capital accounts as a basis for determining the value of the partnership. *See Johnson,* 277 N.W.2d at 213.

The trial court correctly defined the Lewis brothers' animal clinic as a professional partnership but erred in concluding that under *Holbrook* it was barred from considering the formula set out in the cross-purchase agreement as evidence of the partnership's worth. In part, the purchase amount called for in the agreement put an approximate value on partnership assets and liabilities—such as the clinic building, personalty, accounts receivable, accounts payable and capital accounts—that the trial court was obliged to consider in valuing the veterinary partnership. To the extent that the purchase amount includes compensation for professional goodwill, the cross-purchase agreement establishes a concrete "method of liquidating value," *Holbrook,* at 351, 309 N.W.2d at 355, and, therefore, the trial court may use the entire purchase amount as a guide in valuing Jordan's partnership interest. We remand to the trial court for a valuation of the animal clinic partnership that takes the cross-purchase formula into account.

The second issue on appeal is whether the trial court abused its discretion in awarding Sandra maintenance of $200 a month for thirty-six months. We agree with Sandra that the trial court did abuse its discretion.

The test of the amount or time limitation for the payment of maintenance is a matter of trial court discretion. *Hartung v. Hartung,* 102 Wis. 2d 58, 66, 306 N.W.2d 16, 20 (1981). The exercise of discretion is not, however, the equivalent of unfettered decision-making. *Id.* A discretionary determination, to be sustained, must demonstrably be made and based upon facts appearing in the record and in reliance on the appropriate and applicable law. *Id.*

Section 767.26, Stats., enumerates the factors that a court must consider before ordering maintenance.[3] It is not enough that the relevant factors upon which discretion could have been based may be found obscurely in the record. *Hartung,* 102 Wis. 2d at 67, 306 N.W.2d at 21. If the exercise of discretion is to be upheld, it must be demonstrated on the record that those factors were considered in making the discretionary determination. *Id.*

---

[3] Section 767.26, Stats., provides:

Upon every judgment of annulment, divorce or legal separation, or in rendering a judgment in an action under s. 767.02 (1) (g) or (j), the court may grant an order requiring maintenance payments to either party for a limited or indefinite length of time after considering:

(1) The length of the marriage.

(2) The age and physical and emotional health of the parties.

(3) The division of property made under s. 767.255.

(4) The educational level of each party at the time of marriage and at the time the action is commenced.

(5) The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.

(6) The feasibility that the party seeking maintenance can become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and, if so, the length of time necessary to achieve this goal.

(7) The tax consequences to each party.

(8) Any mutual agreement made by the parties before or during the marriage, according to the terms of which one party has made financial or service contributions to the other with the expectation of reciprocation or other compensation in the future, where such repayment has not been made, or any mutual agreement made by the parties before or during the marriage concerning any arrangement for the financial support of the parties.

(9) The contribution by one party to the education, training or increased earning power of the other.

(10) Such other factors as the court may in each individual case determine to be relevant.

The trial court mentioned none of the factors enumerated in sec. 767.26, Stats., and gave no explanation for either the amount or the duration of the maintenance that it awarded to Sandra. We remand to the trial court for a maintenance determination based upon the statutory factors.

The final issue before us is whether the trial court abused its discretion in ordering Jordan to contribute $1,000 to Sandra's attorney fees. We agree with Jordan that the trial court did abuse its discretion.

Before awarding attorney fees, a trial court must make the following factual determinations:

1. the spouse receiving the award needs the contribution;

2. the spouse ordered to pay has the ability to do so; and

3. the total fee is reasonable (this provides guidance in determining what is a reasonable contribution).

*Holbrook,* 103 Wis. 2d at 343, 309 N.W.2d at 351. The trial court made none of the requisite determinations as a basis for its fee award. We remand to the trial court for the necessary findings.

*By the Court.*—Judgment reversed and cause remanded.