**In re the MARRIAGE OF William Sterling HUFF, Petitioner/Cross–Respondent,**

**and**

**Joada Hankins Huff, Respondent/Cross–Petitioner.**

**No. 91SC266.**

Supreme Court of Colorado,
En Banc.

July 20, 1992.

As Modified on Denial of Rehearing
Aug. 24, 1992.

Litvak & Litvak, P.C., Lawrence Litvak, Holme Roberts & Owen, C. Jean Stewart, Denver, for petitioner, cross-respondent.

Williams, Youle & Koenigs, P.C., Michael A. Williams, Denver, for respondent, cross-petitioner.

Justice VOLLACK delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' unpublished opinion in *In re Marriage of Huff*, No. 89CA1190 (Colo. App. Feb. 21, 1991). Both the wife and husband assert multiple errors in the court of appeals opinion. We affirm in part, reverse in part, and remand with directions.

## I.

The wife and husband were married in 1958. At the time of their marriage, the husband had graduated from both college and law school. The wife had graduated from college.

In 1961, the wife and husband resided in Boston where the husband returned to school and obtained a master of law degree. While in Boston, both the husband and the wife worked part-time. The husband operated a mimeograph machine in the history department at a local university. The wife worked for approximately one year in a store, sorting art prints. For the remainder of their marriage, the wife worked as a homemaker and raised the children.

In 1962, the wife and husband moved to Denver. The husband worked as an associate with a local law firm. In 1964, their daughter was born. In 1965, the husband left the law firm to become an assistant professor of law at the University of Denver. The couple's second child, a son, was born in 1968. In 1973, the wife and husband purchased a house. The wife has lived in this house since the purchase.

In 1977, the husband moved out of the family home and moved into an apartment. The wife and children remained in the family home. The wife and husband never lived together again. In 1978, the husband quit his teaching job and began working full-time as a partner with a Denver law firm.

In 1980, the husband created an irrevocable life insurance trust which named the wife as trustee. In 1985, the husband asked the wife, as trustee of the irrevocable life insurance trust, to borrow approximately $30,600 against the cash value of the trust. The husband needed the money for a downpayment on a house he wanted to purchase. The wife agreed, and the husband used the money to buy the house that same year.

In February 1987, the husband filed a petition for dissolution of marriage or legal separation, claiming the marriage was irretrievably broken. At the time of the filing, the husband was 52 and the wife was 50.

In February 1989, the district court for the City and County of Denver conducted a dissolution hearing in which the court heard testimony from the wife, the husband, and various other witnesses regarding the allocation of property, maintenance, child support, and other matters which arose from the parties' marital dissolution. Both parties offered accounting experts who testified regarding the value of the husband's partnership interest in his law firm. The husband also introduced the testimony of a vocational rehabilitation expert.

On February 24, 1989, the district court issued its decree and permanent orders. In its award of child support, the district court ordered the husband to pay the son's expenses for his last year of college, but specified that obligation would terminate upon the son's graduation or on January 1, 1991, whichever first occurred.

Next, the district court disposed of the marital property. The district court rejected the husband's argument that the marital property should be valued as of the date of the parties' separation in 1977. Pursuant to section 14–10–113(5), 6B C.R.S. (1987),[1] the district court divided the property based on its value at the time of the dissolution decree.

The district court found the marital estate to be worth $871,000. The court awarded $442,000 to the wife and $428,000 to the husband. The district court found that the irrevocable life insurance trust had a $23,000 cash surrender value and included the cash surrender value of the trust in the wife's award.[2] The district court did not require either party to repay the $30,600 borrowed from the trust in 1985, but did order the husband to pay the interest on the money borrowed from the trust so

---

1. This section provides that "property shall be valued as of the date of the decree."

2. The wife and husband both treated the irrevocable life insurance trust as marital property. Based on their representations, the district court treated the trust as marital property.

that the trust would retain its value.[3] The court also ordered the husband to pay any termination costs incurred by the wife, if she chose to terminate the trust.

The district court also found that $113,-000 represented the value of the husband's interest in his law firm. This value, which was offered by the husband's expert, was based on the "excess earnings" method for valuing an interest in a business or partnership. The court concluded that this value most accurately represented the value of the husband's partnership interest in his law firm. The court rejected a $42,442 figure, which was based on a formula in the husband's partnership agreement, because this figure did not consider all the present facts and intentions of the parties. The court rejected a value provided by the wife's expert, which was based on the excess earnings method, because the expert's capitalization rate of 5 was too high.

After disposition of the marital property, the district court ordered the husband to pay maintenance to the wife. The court found that the wife had met the threshold requirements of section 14–10–114(1)(a) and (b), 6B C.R.S. (1987).[4] The court concluded that the assets the wife received in the property distribution were not sufficient to pay her expenses and that, at the time of the decree, she would not be able to support herself through appropriate employment. The district court ordered maintenance to be paid as follows:

> For the remainder of calendar year 1989 and calendar year 1990, maintenance in the amount of $5,000 per month. For calendar year 1991 and 1992 $4,000 per month. For calendar years 1993 and 1994 $3,000 per month. For the years 1995 and 1996 $2,000 per month. For the years 1997 and until [the wife] dies or remarries $1,000 [per month].

**3.** During the dissolution hearing, the wife requested the district court to order the husband to repay the $30,600 borrowed from the trust. The husband testified that the family had borrowed money against other life insurance policies in the past. The husband requested that he not be required to repay the money.

**4.** Section 14–10–114(1)(a) and (b), 6B C.R.S. (1987), provides that maintenance may be

The district court also ordered the husband to pay the wife's attorney fees. The court concluded that $40,000 was a "reasonable and necessary" amount for the wife's attorney fees. The court then ordered the husband to pay $30,000 of the wife's attorney fees, and gave him a $10,-000 credit for money he had "previously given [the wife] for attorney fees." The court further ordered that the husband would not be required to pay the attorney fees until June 1990. The court stated that "[a]t that time [the husband] shall increase the maintenance payment in amount sufficient to pay the $30,000 over a three-year period."

The court of appeals affirmed in part, reversed in part, and remanded the case to the district court with directions. The court of appeals affirmed the district court's maintenance award and its marital property disposition, including the district court's valuation of the partnership interest and treatment of the trust as marital property. The court of appeals also affirmed the district court's ruling that the husband pay the interest on the money borrowed against the life insurance trust. In affirming the district court's decision, the court of appeals stated that "[a]ny claim which the wife as a trustee of the trust may have, in contrast to claims she has as spouse, are not the subject matter of this action for dissolution." Regarding attorney fees, the court of appeals affirmed the district court's order requiring payment of attorney's fees as increased maintenance. However, the court of appeals reversed the district court's award of a $10,000 credit to the husband and ordered the husband to pay the full $40,000 amount of wife's attorney fees. The court of appeals reversed the district court's ruling

awarded only if certain findings are first made by the trial court. This section provides:

> (1) In a proceeding for dissolution of marriage ..., the court may grant a maintenance order for either spouse only if it finds that the spouse seeking maintenance:
> (a) Lacks sufficient property ... to provide for his reasonable needs; and
> (b) Is unable to support himself through appropriate employment....

regarding payment of the son's college expenses. The court of appeals held that a child who is twenty-one years old and capable of self-support, but voluntarily chooses to attend college, is not entitled to receive child support payments.

We granted certiorari to consider the wife's and husband's allegations of error in the court of appeals opinion.

## II.

Both the wife and the husband assert error concerning the award of attorney fees.

## A.

The wife argues that the court of appeals erred in affirming the district court's order that the husband pay the wife's attorney fees through increased maintenance payments over a three-year period. We agree.

The Uniform Dissolution of Marriage Act, §§ 14–10–101 to –133, 6B C.R.S. (1987) (the Act), provides separate sections that govern the different elements of a dissolution order. Section 14–10–113, 6B C.R.S. (1987), governs the disposition of property. Section 14–10–114, 6B C.R.S. (1987), governs the award of maintenance. Section 14–10–115, 6B C.R.S. (1987), governs the payment of child support. Section 14–10–119, 6B C.R.S. (1987), governs the award of attorney fees.

The Act requires a district court to make separate property, maintenance, and attorney fees orders based on separate considerations. The court must first divide the marital property. § 14–10–113; *In re Marriage of Jones*, 627 P.2d 248, 252 (Colo. 1981). Once the property division is made, the court then decides whether maintenance is necessary to provide for the reasonable needs of one of the parties. § 14–10–114; *Jones*, 627 P.2d at 253. The award of maintenance is based on both the property awarded and on the earning capacity of the party seeking maintenance. *Id.* at 252. Section 14–10–119 provides that attorney fees may be awarded based on the "financial resources" of the parties.[5] Each of these awards—property, maintenance, and attorney fees—can be separately appealed. *See Jones*, 627 P.2d at 253.

In the present case, the attorney fees were awarded in light of the parties' financial resources *after* the court had divided the property and awarded the wife maintenance. *Id.* at 254 (after remanding case to reconsider maintenance award, court set aside award of attorney fees "[b]ecause the propriety of an award of attorney's fees is to be judged in light of the financial resources of the parties").

District courts may not, under the statutory scheme, incorporate attorney fees into maintenance awards. Instead, courts must apply separate and distinct standards for the award of either. While an award of attorney fees must be reviewed in light of the parties' financial resources after the property division and any maintenance award, the Act does not contemplate that these separate awards should be combined. *See In re Marriage of Aslaksen*, 148 Ill.App.3d 784, 102 Ill.Dec. 469, 474, 500 N.E.2d 91, 96 (1986) (finding that "trial court erred in awarding attorney fees as maintenance in that the [Dissolution of Marriage Act] does not provide for the payment of an award of attorney fees as maintenance"). Thus, the district court erred when it ordered the wife's attorney fees to be paid by the husband in the form of increased maintenance payments to the wife.[6]

---

5. Section 14–10–119 provides:
   **Attorney's fees.** The court from time to time, after considering the financial resources of both parties, may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this article and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment. The court may order that the amount be paid directly to the attorney, who may enforce the order in his name.

6. Maintenance and attorney fees are treated differently for tax purposes. Combining the attorney fees into the husband's maintenance payments allows the husband to treat the attorney fees as maintenance and deduct it from his before-tax income. As a result, the wife has a

### B.

■ The husband argues that the court of appeals erred when it remanded the case to the district court to modify the order regarding attorney fees. The husband contends that the district court correctly determined that he should receive a $10,000 credit against the payment of the wife's attorney fees for money he had previously given to the wife. The record does not support the husband's argument.

The district court's order stated:

Based upon the testimony of Ms. Tamblyn and Mr. McGuane and the affidavits of the attorneys involved in the case, *the Court determines that $40,000 is a reasonable and necessary amount for attorney fees for [the wife].* The Court has considered that [the wife] was in a more difficult position without having the financial information and without being an attorney.

The Court will require [the husband] to pay $30,000 of the wife's attorney fees. *This provides [the husband] with a credit of $10,000 for the amount of additional money he has previously given to [the wife] for attorney fees.*

(Emphasis added.)

The district court gave the husband a credit towards the payment of the wife's attorney fees for money he had given the wife prior to the dissolution. At the time of the district court proceedings, the balance of these funds remained in the wife's bank account. The husband did not testify that these funds were designated for payment of attorney fees; rather, the husband testified that he gave this money to the wife to make house repairs and replace appliances. Based on the husband's own testimony, this money was not given to the wife for attorney fees. Thus, the record does not support the district court's award of a $10,000 credit to the husband for money previously given to the wife for attorney fees.

### III.

■ The wife contends that the court of appeals erred in reversing the district court's decision ordering the husband to pay college expenses for their son after he reaches the age of twenty-one.[7] We agree.

### A.

Section 14–10–115(1), 6B C.R.S. (1987), which governs payment of child support, provides:

**Child support....** (1) In a proceeding for dissolution of marriage, ... the court may order either or both parents owing a duty of support to a child of the marriage to pay an amount reasonable or necessary for his support, without regard to marital misconduct, after considering all relevant factors including:

(a) The financial resources of the child;

(b) The financial resources of the custodial parent;

(c) The standard of living the child would have enjoyed had the marriage not been dissolved;

(d) The physical and emotional conditions of the child and his educational needs; and

(e) The financial resources and needs of the noncustodial parent.

The issue raised by the facts of this case is whether the district court had the authority, pursuant to section 14–10–115, 6B C.R.S. (1987), to order the husband to pay the son's expenses for his final year of college as part of a dissolution of marriage decree issued prior to the son's twenty-first birthday.[8]

---

higher taxable income from the increased maintenance payments.

The court decided that the husband is responsible for the payment of the wife's attorney fees. Thus the husband, not the wife, should incur any tax consequences associated with the payment of these fees.

**7.** The son was twenty years old on February 24, 1989, the date the district court issued its orders. He turned twenty-one in June 1989.

**8.** Section 14–10–115(1.5), 6B C.R.S. (1991 Supp.), which provides new guidelines for an award of postsecondary education support, is not applicable to this case. That statute became effective July 1, 1991.

A decision concerning child support is within the sound discretion of the trial court, based on the court's consideration of the enumerated factors, and will not be disturbed on appellate review absent an abuse of discretion. *See In re Marriage of Plummer*, 735 P.2d 165, 166 (Colo.1987); *Carlson v. Carlson*, 178 Colo. 283, 288, 497 P.2d 1006, 1009 (1972). The factors listed in section 14–10–115(1) "must be applied in determining child support in an order entered prior to emancipation." *Plummer*, 735 P.2d at 167. Under section 14–10–115, a trial court may require post-emancipation support in proper circumstances by an express provision in the decree. *See id.* at 167 n. 1.

The record indicates that the district court based its decision regarding child support on the factors listed in section 14–10–115. The district court found that education had always been important to the family, that the husband had paid for the other child's college education, and that he had paid all of the son's expenses during the first three years of college. The court also found that the husband was expected to gross over $200,000 in the year following the dissolution and could afford to pay for the son's final year of college expenses. The district court stated that "[i]n considering the standard of living the child would have enjoyed had the marriage not been dissolved, it would certainly be anticipated that he would obtain a college education by support of his parents."[9] Our review of the record indicates that the district court did not abuse its discretion when it ordered the husband to pay the son's college expenses.

Our conclusion that the district court had the authority to enter a decree of support in this case is further supported by the language in section 14–10–122(3), 6B C.R.S. (1987). Section 14–10–122(3) provides: "Unless otherwise agreed in writing *or expressly provided in the decree*, provisions for the support of a child are terminated by emancipation of the child...." (Emphasis added.) This language indicates that the General Assembly intended to give trial courts the authority, guided by the factors in section 14–10–115, to extend support beyond the age of twenty-one. *See Climax Molybdenum Co. v. Walter*, 812 P.2d 1168, 1173 (Colo.1991) (statutory terms are to be given effect according to their plain and obvious meaning). A conclusion that the trial court did not have this authority would render the emphasized language generally meaningless. "Courts should attempt to give effect to all parts of a statute, and construction that would render meaningless a part of the statute should be avoided." *People v. Terry*, 791 P.2d 374, 376 (Colo.1990).

### B.

The husband argues that the general rule under *In re Marriage of Plummer*, 735 P.2d 165 (Colo.1987), is that a trial court may not order child support payments for a child once that child attains the age of twenty-one. He contends that the only exceptions to this rule are situations in which the child is disabled or the judgment is final. The husband's reliance on *Plummer* in this case is misplaced.

In *Plummer*, the final orders issued by the trial court did not contain a provision concerning child support for the husband and wife's two daughters. The husband voluntarily contributed, however, to the support of the daughters. The husband terminated the support of the younger daughter when she attained the age of twenty-one. At the time, she was still in her third year of college. Subsequently, the mother filed a motion in the trial court requesting that the husband pay child support for the daughter's last year of college. The husband argued that, "in the absence of a contrary provision in a support order entered prior to emancipation, the duty to support a child terminates when the child reaches twenty-one years of age, unless the child is physically or emotionally disabled."

---

9. The husband requested that he and the son be allowed to reach an agreement with regard to college expenses. The district court stated in its order that past experience showed that it may be difficult for the husband and son to communicate and reach such an agreement, and referred to a specific communication between the two as an example of the problem.

*Id.* at 166. The trial court granted the wife's motion and ordered the husband to pay $200 per month in support until the younger daughter graduated or otherwise became emancipated. *Id.* This court reversed, finding that the daughter had reached the age of twenty-one prior to the request for child support and that the daughter was not disabled.

*Plummer* is factually distinguishable from the present case. In the present case, the wife requested child support at the time of the dissolution decree, before the son had turned twenty-one. The final orders were issued prior to the son turning twenty-one and contained a provision regarding child support.

Furthermore, in *Plummer* this court recognized a distinction between the court's consideration of child support requests prior to the age of twenty-one and its consideration of child support requests after emancipation. In reversing the court of appeals, this court stated: *"While these factors [in subsections 14–10–115(1)(c) and (d)] must be applied in determining child support in an order entered prior to emancipation,* they are not determinative in a case such as this where the child has reached the age of majority and does not fall under the *Koltay* [*v. Koltay,* 667 P.2d 1374 (Colo.1983),*]* disability exception." *Plummer,* 735 P.2d at 167. This court also stated: "We recognize that the parties may agree to post-emancipation support, *or that a court may require such support in proper circumstances by express provisions in a decree."* *Id.* at 167 n. 1.

### C.

■ The husband argues in the alternative that, even if the district court had the authority to order payment of the college expenses, it still abused its discretion because it failed to divide the college expenses between the husband and wife as required by section 14–10–115(13)(a), 6B C.R.S. (1987). We disagree.

Section 14–10–115(13)(a) provides that "[b]y agreement of the parties or by order of the court, the following reasonable and necessary expenses incurred on behalf of the child *shall be divided between the parents in proportion to their adjusted gross income:* ... (III) The expenses for any institution of higher education." (Emphasis added.) Section 14–10–115(1) provides that in a dissolution of marriage proceeding the court may order *either* or both parents to pay child support. Reading this section together with section 14–10–115(13)(a), the trial court has the discretion, after reviewing the parties' respective gross incomes, to order only one of the spouses to pay college expenses.

The district court determined that the husband's gross income exceeded $200,000 per year and that he could afford to pay the son's college expenses. The wife's income consisted of any income she would receive from the assets allocated to her in the property distribution and the money she would receive from maintenance payments. This amount was significantly less than the husband's gross income from his law practice. The court had the discretion to order only the husband to pay the college expenses, and the record indicates that the trial court did not abuse this discretion.

### IV.

■ Both the wife and the husband contend that the district court's maintenance award was improper. The wife contends that the maintenance award did not properly consider the intentions and reasonable expectations of the parties. She also argues that the maintenance award and property division create an unjust disparity in the standard of living between the wife and husband. The husband argues that the district court abused its discretion because the award is permanent and does not consider that the wife's earning ability combined with the property award should allow her to become self-sufficient.

At this time, the maintenance award is just. If future events occur or fail to occur which make it unjust, the district court has retained jurisdiction to modify the maintenance award. Accordingly, we reject the parties' contentions and affirm the district court's ruling.

In a dissolution of marriage proceeding, maintenance and property awards are matters generally within the sound discretion of the trial court, and will not be reversed on appeal absent an abuse of discretion. *Carlson v. Carlson*, 178 Colo. 283, 288, 497 P.2d 1006, 1009 (1972). In determining whether the trial court abused its discretion, the property and maintenance award must be considered together. *In re Marriage of Jones*, 627 P.2d 248, 251 (Colo. 1981). The dual intention of the maintenance section and disposition of property section "is to encourage the court to provide for the financial needs of the spouses by property disposition rather than by an award of maintenance." Uniform Marriage and Divorce Act § 308, 9A U.L.A. 348 official cmt. (1987). Only after the trial court has divided the property may the court determine, by application of the statutory standards enumerated in section 14–10–114(1), 6B C.R.S. (1987), whether maintenance is necessary to provide for the reasonable needs of one of the parties. *In re Marriage of Jones*, 627 P.2d 248, 253 (Colo.1981). "If maintenance is necessary, *the amount is then to be set by careful application of the criteria in section 14–10–114(2)(a)–(f).*" *Id.* (emphasis added).

Thus, a trial court must first make a threshold finding that maintenance is necessary before considering any amount. Section 14–10–114(1)(a) and (b), 6B C.R.S. (1987), which provides the standards a court must follow in determining whether maintenance is necessary, requires a trial court to find that the spouse seeking maintenance "(a) [l]acks sufficient property ... to provide for his reasonable needs; and (b) [i]s unable to support himself through appropriate employment."

In this case, the district court found that the wife satisfied both of these statutory prerequisites. The district court first ruled that, although the wife had been awarded $250,000 in cash assets in the property distribution, "this amount of cash would not produce sufficient income, after taxes, to pay [the wife's] expenses." A review of the financial information in the record and the parties' standard of living at the time of the decree supports this finding and provides no basis to overturn the district court's ruling.

The district court also ruled that "at this time [the wife] is unable to support herself through appropriate employment to make up any difference." The testimony from the husband's vocational rehabilitation counselor supports this finding.[10] Thus, the record supports the district court's findings that maintenance was necessary in this case.

Once a trial court determines that maintenance is necessary, the trial court must next apply the factors set out in section 14–10–114(2)(a)–(f), 6B C.R.S. (1987), to determine the duration and amount of maintenance. This section provides:

(2) The maintenance order shall be in such amounts and for such periods of time as the court deems just, ... and after considering all relevant factors including:

(a) The financial resources of the party seeking maintenance, ... and his ability to meet his needs independently ...;

(b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment and that party's future earning capacity;

(c) The standard of living established during the marriage;

(d) The duration of the marriage;

---

**10.** The husband offered the testimony of a vocational rehabilitation counselor who had evaluated the wife. The counselor testified that the wife needed counseling and vocational training in order to reenter the labor market because she "has no experience or training right now ... that she can use to gain access to competitive employment." The counselor concluded that the wife had the intellectual capacity to succeed in any program she decided to pursue and that, after counseling and training, the wife would be qualified to enter the labor market as a librarian, technical writer, or legal/medical secretary. On cross-examination, the counselor testified that currently there are more older workers in the labor market, but recognized that some employers still discriminate against older people. The wife did not offer a vocational expert to testify on her behalf.

(e) The age and the physical and emotional condition of the spouse seeking maintenance; and

(f) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

The district court's order demonstrates that it carefully applied the criteria in section 14–10–114(2) in its maintenance order. The court found that, at the time of the proceedings, the wife did not have sufficient funds after the property division to support herself and that it would take the wife "some period of time" to acquire the necessary skills and background to enter the labor market and obtain appropriate employment.[11] The district court also considered the length of the marriage, the wife's age, her physical and emotional condition, and the husband's ability to pay. The district court determined that the maintenance award should provide the wife with the same standard of living as she and her husband had established during the marriage. Finally, the district court expressly retained jurisdiction to modify the maintenance award. The district court's maintenance order does not constitute an abuse of discretion.

We note, however, that the district court expressly retained jurisdiction to modify the maintenance, and that the statute allows modification "upon a showing of changed circumstances so substantial and continuing as to make the terms unconscionable." § 14–10–122, 6B C.R.S. (1987).

In its maintenance order, the district stated that:

The amount of maintenance required by this Court order and its duration *hopefully* will provide for a standard of living for [the wife] as established during the

marriage.... If [the wife] chooses not to work, the amount of maintenance and the assets distributed to her are sufficient to take care of her needs. At some point [the wife] could sell the house and use a good portion of the proceeds to provide interest income.

(Emphasis added.)

While the wife is not entitled to the same gross income as the husband, she is entitled, under the statute and the facts of this case, to the standard of living she enjoyed at the time of the decree. Even though the husband and wife lived apart for eleven years, the husband and wife had established a comfortable standard of living prior to the dissolution. Furthermore, this was a long-term marriage in which the wife sacrificed her career goals in order to remain home and care for the children and the family home. The standard-of-living factor in section 14–10–114, 6B C.R.S. (1987), is of particular importance in determining the amount of maintenance where the marriage is one of long duration and the wife worked as a homemaker and remained at home to raise the children. *See Weiss v. Weiss*, 702 S.W.2d 948, 956 (Mo.Ct. App.1986).

The district court has provided the wife with sufficient income presently to maintain her standard of living while she is attempting to find employment. However, the wife's age, physical and emotional condition, and lack of marketable skills could make obtaining appropriate employment difficult. Under the particular facts of this case, the standard of living the wife enjoyed at the time of the decree should not decline to the extent that she must sell her house to pay her expenses because she is unable to obtain appropriate employment.[12]

---

**11.** While we recognize that the wife's age and the length of time she has been out of the labor market will make finding employment difficult, the statute requires the district court to consider the time necessary to enable the wife to find appropriate employment and the wife's future earning capacity. If the district court finds that the wife is employable, the statute requires that the trial court consider this in its award of maintenance. The testimony of the husband's vocational rehabilitation counselor supports the district court's finding that the wife would be employable after counseling and training. The wife did not offer a vocational expert to rebut this testimony.

**12.** Of course, if the wife should find a job that provides her with the financial resources to be self-sufficient, nothing in this opinion precludes the husband from requesting a modification of the maintenance award.

## V.

Next we address the issues concerning the irrevocable life insurance trust premised on the court of appeals' statement that "[a]ny claim which the wife as a trustee of the trust may have, in contrast to claims she has as spouse, are not the subject matter of this action for dissolution."

The wife contends that the district court erred in treating the trust as marital property. In the district court, the wife, husband, and court treated the trust as a marital asset. The wife contends, however, that the district court should have treated the irrevocable life insurance trust as separate property. She asserts that *because the trust is separate property,* the district court did not have subject matter jurisdiction over the trust.

The court of appeals concluded that the trust was marital property. We conclude that, under the particular facts of this case, the court of appeals did not need to reach the issue as to whether the trust was separate property.

Both the wife and husband treated the trust as marital property in the dissolution proceeding before the district court. The wife's financial affidavits and statements submitted to the trial court treated the trust as marital property. When asked by this court during oral argument whether this was true, the wife's counsel responded, "That's exactly right."

■ A party on appeal "may not avail himself of an alleged error which he induced the [trial] court to commit." *Heimbecher v. City and County of Denver,* 90 Colo. 346, 351, 9 P.2d 280, 282 (1932); *Jacobs v. Commonwealth Highland Theatres, Inc.,* 738 P.2d 6, 11 (Colo.App.1986) (defendant cannot assert errors in actions it induced the court to perform); *see also Caldwell v. Kats,* 193 Colo. 384, 385–86, 567 P.2d 371, 372 (1977) (parties cannot claim error when they are responsible for the posture in which they placed themselves); *Millenson v. Department of High-*

*ways,* 590 P.2d 979, 983 (Colo.App.1978) ("The parties are responsible for the posture in which they have placed themselves and thus may not on appeal avoid the consequences that flow therefrom.").

■ We conclude that, under these facts, the wife may not, in this appeal, question the district court's treatment of the trust as a marital asset because she requested that very classification in the district court.

■ The wife's argument that the district court lacked subject matter jurisdiction is based on the trust first being classified as separate property. For the reasons stated, however, the wife is precluded from alleging error in the district court's treatment of the trust as marital property. Because the trust was marital property for the purposes of this proceeding, the district court had jurisdiction over the trust.

The wife and husband also request this court to determine whether the wife is precluded from bringing a claim as trustee in a separate district court action. We do not address this issue because it is not properly before this court. Any claim that the wife has a right to bring a separate action must first be addressed by the district court in which the wife filed that action.[13]

## VI.

■ The husband contends that the property acquired during the eleven and one-half years in which the parties lived apart should be treated differently from the other marital property because the wife did not make any contribution to the acquisition of that property. We disagree.

The Act explicitly defines what constitutes "marital property" for the purposes of a marital property division. Section 14–10–113(3), 6B C.R.S. (1987), provides:

*All property acquired by either spouse subsequent to the marriage and prior to a decree of legal separation is presumed to be marital property,* regardless of whether title is held individually or by the spouses in some form of

---

13. Accordingly, we disapprove of the court of appeals' statement that the wife's claims as trustee are not the subject matter of the dissolu-

tion proceeding to the extent that it indicates whether the wife, as trustee, may or may not bring a separate suit.

coownership.... *The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection (2) of this section.*

(Emphasis added.)

The Act also explicitly lists the types of property excepted from "marital property" for purposes of a marital property division. Section 14–10–113(2), 6B C.R.S. (1987), provides:

(2) For purposes of this article only, "marital property" means all property acquired by either spouse subsequent to the marriage except:

. . . .

(c) Property acquired by a spouse *after a decree of legal separation;* and

(d) Property excluded by valid agreement of the parties.

(Emphasis added.)

Although the parties lived apart for eleven and one-half years, they were not separated pursuant to a decree of legal separation. The wife and husband did not have a valid agreement which excluded from their marital property the property acquired during the period of time they lived apart. The husband does not state any other ground which overcomes the statutory presumption.

The record demonstrates that the wife contributed to the marriage as the homemaker during the eleven and one-half year period. *See* § 14–10–113(1)(a), 6B C.R.S. (1987) (contribution of homemaker relevant). As the district court concluded, the wife devoted her time and energy to raising the two children, including a "great deal of time" helping the children overcome their learning disabilities.

The district court properly included in the marital property division the property acquired during the period of time that the wife and husband lived apart.

## VII.

Finally, the husband claims that the district court erred in determining the value of his law practice.

## A.

█ The husband first contends that the district court erroneously relied on the excess earnings method. The husband argues that the valuation of the law practice must be based on the formula set forth in the law firm's partnership agreement. We disagree.

In this case, the parties introduced conflicting expert testimony concerning the value of the husband's partnership interest. The husband's expert offered two different valuations. The first valuation was based on a formula contained in the husband's firm's partnership agreement which was used to cash out partners who left the firm. The expert testified that the value of the husband's partnership interest under this formula was $42,442. The husband's expert also valued the firm based on the "excess earnings" method. The value of the husband's interest based on this method was $113,000. The wife's expert based his valuation on the "excess earnings" approach and valued the husband's partnership interest at $309,500. The difference between the two "excess earnings" valuations was mainly the result of the husband's expert using a capitalization rate of 3 and the wife's expert using a capitalization rate of 5.

The valuation of the law practice thus was a question of fact to be resolved by the district court as fact-finder. The district court chose the $113,000 value provided by the husband's expert. An appellate court may not disturb the factual findings of the district court sitting without a jury unless the findings are clearly erroneous and not supported by the record. *Gebhardt v. Gebhardt,* 198 Colo. 28, 30, 595 P.2d 1048, 1050 (1979); *In re Marriage of Hoffman,* 650 P.2d 1344, 1345 (Colo.App.1982); *see also In re Marriage of Bayer,* 687 P.2d 537, 539 (Colo.App.1984) (where value of wife's interest in business was subject to conflicting expert testimony and trial court chose to believe wife's expert, appellate court would not disturb this finding of fact).

The district court selected a value based on the excess earnings method, which is a generally accepted method for determining the present value of someone's interest in a business. *See In re Marriage of Bookout*, 833 P.2d 800, 804–805 (Colo.App.1991) (affirming trial court's use of excess earnings approach); *Dugan v. Dugan*, 92 N.J. 423, 457 A.2d 1, 9 (1983) (adopting excess earnings approach in valuation of law practice for purposes of divorce proceeding); *In re Marriage of Hall*, 103 Wash.2d 236, 692 P.2d 175, 179–80 (1984) (trial court may consider various methods for valuing goodwill of spouse participating in partnership, including excess earnings method or formula in partnership agreement); Alan S. Zipp, *Divorce Valuation of Business Interests: A Capitalization of Earnings Approach*, 23 Fam.L.Q. 89, 102 (1989) (capitalization of excess earnings approach is one of the methods recommended by the American Institute of Certified Public Accountants and is a method relied on by the Internal Revenue Service to value a business for tax purposes).

The excess earnings approach capitalizes the amount by which the attorney's historical earnings exceed that which an attorney with similar education, experience and capabilities earned during that period. *See Bookout*, at 803, 805; *Dugan*, 457 A.2d at 9. This method results in a valuation that represents the value of both the tangible assets and goodwill of the husband's partnership interest on the dissolution date.[14] Zipp, *supra*, at 91, 102. The excess earnings valuation method is an appropriate valuation in a dissolution proceeding because it provides the present value of the partnership interest to the participating spouse and "avoids the problem of valuing a business on the basis of postdivorce earnings and profits." *Id.* at 89, 102.

The district court accepted the excess earnings valuation from the husband's expert which valued the law practice at $113,000. The court chose this value because it found the husband's expert's capitalization rate of 3 was more realistic than the wife's expert's capitalization rate of 5. The district court found the capitalization rate of 5 "too high considering all the factors."[15]

In rejecting the expert testimony regarding the valuation based on the partnership agreement, the district court stated:

> The court is rejecting the $42,442 evaluation which is based upon the partnership agreement. The reason the Court is rejecting this figure is because all the evidence before the Court is that [the husband] has every intention of staying with [the law firm] and would not be withdrawn as of this date and thus be entitled to receive only his portion of the accounts receivable pursuant to the partnership agreement. To accept the $42,000 figure ignores all the present facts and intentions of the parties.

The wife's expert testified that he did not rely on the formula in the partnership agreement because that value represented the amount given to a partner who leaves

---

**14.** Goodwill has long been accepted in Colorado as an attribute of a business, trade or profession. *See Lerner v. Stone*, 126 Colo. 589, 595, 252 P.2d 533, 536 (1952); *In re Marriage of Bookout*, 833 P.2d 800, 804 (Colo.App.1991) (holding that husband's goodwill in physical therapy practice is divisible marital asset); *In re Marriage of Nichols*, 43 Colo.App. 383, 385, 606 P.2d 1314, 1316 (1979) (holding that value of goodwill in a dental practice is an asset acquired during marriage and must be considered marital property).

The excess earnings method determines the value of goodwill, if any, which exists at the date of dissolution. As the New Jersey Supreme Court stated in *Dugan v. Dugan*, 92 N.J. 423, 457 A.2d 1, 6 (1983):

> It would be inequitable to ignore the contribution of the non-attorney spouse to the development of [goodwill]. An individual practitioner's inability to sell a law practice does not eliminate existence of goodwill and its value as an asset to be considered in equitable distribution. Obviously, equitable distribution does not require conveyance or transfer of any particular asset. The other spouse, in this case the wife, is entitled to have that asset considered as any other property acquired during the marriage partnership.

**15.** In explaining how the capitalization rate is determined, the husband's expert testified: "A capitalization rate is a rate that is selected based on the risks inherent in a particular investment. In looking at law practices, in valuing excess earnings, typically we look at a capitalization factor between one and five, one being for very weak practices."

the firm. The husband's expert testified that the partnership agreement was designed to discourage partners from leaving the firm. The partnership agreement allows a withdrawing partner to receive his or her accounts receivable minus fifty percent, plus his or her share of the capital account.[16] The wife's expert testified that he used the excess earnings approach because that method provided a value as to what the partnership interest was worth to the husband if he remained in the firm. Harriet N. Cohen and Patricia Hennessey, *Valuation of Property in Marital Dissolutions*, 23 Fam.L.Q. 339, 368 (1989) (partnership formulas for compensating a withdrawing partner may be punitively low, and such formulas do not reflect a common fact in divorce: that the spouse is remaining with the firm).

We find that the district court's decision is supported by the record.[17]

### B.

■ The husband also argues that the district court's use of the excess earnings method results in a "double dipping" by the wife into the husband's income. The husband contends that the excess earnings approach converts his future income into property which is then divided between the spouses. He contends that "double dipping" occurs because that same future income is the source from which the wife's maintenance is paid. The husband contends that the wife receives double benefits

from the same source: the husband's future income. We disagree.

As stated above, the excess earnings approach is a valuation method which capitalizes the excess earnings based on a comparison of the husband's past earnings to the past earnings of an attorney in the same area with the same education, experience, and capabilities. Based on these historical earnings, this method provides a valuation which represents the present value of the husband's partnership interest. The excess earnings approach does not convert the husband's future income into property; on the contrary, it avoids valuing a business or partnership on the basis of postdivorce earnings and profits. *See Bookout*, at 804–805; *Zipp, supra*, at 102.

### VIII.

In summary, we affirm the court of appeals decision concerning: the attorney fees credit; maintenance; the property acquired during the time the parties lived apart; and the valuation of the husband's partnership interest. We also affirm the court of appeals decision that the trust is marital property, but do so for different reasons. We disapprove of any statement by the court of appeals as to whether the wife is precluded from bringing a separate action as trustee because that issue is not properly before this court in this case.

We reverse the court of appeals decision concerning the payment of attorney fees as maintenance and its decision reversing the district court's order that the husband pay

---

16. The husband's expert estimated the husband's accounts receivable at $144,360. Under the agreement, the husband's receivables *were then reduced by fifty percent*. This reduced the husband's share to $72,180. The $72,180 amount was then reduced to account for income taxes, the husband's share of the firm's negative capital account, and other miscellaneous reductions to arrive at the $42,442 figure.

17. We recognize that there is a split of authority regarding whether a partnership agreement is binding on trial courts in dissolution of marriage proceedings. *Compare In re Marriage of Keyser*, 820 P.2d 1194, 1196–97 (Colo.App.1991) (finding that majority of jurisdictions hold that partnership or corporate buy-sell agreements are not binding and concluding that such agreements are not dispositive) *and In re Marriage of*

*Hall*, 103 Wash.2d 236, 692 P.2d 175, 179–80 (1984) (trial court may consider various methods for valuing goodwill of spouse participating in partnership, including excess earnings method or formula in partnership agreement) *with Stern v. Stern*, 66 N.J. 340, 331 A.2d 257, 261 (1975) (if partnership agreement exists, then there is presumption that agreement controls value of spouse's interest) *and Hertz v. Hertz*, 99 N.M. 320, 657 P.2d 1169, 1174 (1983) (partnership agreement is binding). By our decision today, we join those jurisdictions which recognize that a trial court may consider various valuation methods, including a partnership agreement. The decision as to which valuation method to rely on is a factual determination to be made by the trial court.

the son's expenses for his last year of college.

Accordingly, we remand this case to the court of appeals for further proceedings consistent with the views herein expressed.

ROVIRA, C.J., concurs in part and dissents in part.

LOHR, J., does not participate.

Chief Justice ROVIRA concurring in part and dissenting in part:

The majority holds that the district court did not err in using an excess earnings method to establish the value of the husband's interest in his law firm despite the fact that he was bound by a partnership agreement which established the value of that interest. I believe that where a partnership agreement exists, is consistently applied to all partners, and reflects the considered judgement of the partners as to the value of their interests, the value of a partner's interest should be governed by that agreement. Accordingly, I respectfully dissent from Part VII of the majority opinion.

## I

The husband has been a partner in a large, well-established law firm since 1976. The firm had been in existence long before the husband became a partner, and at the time of the trial, the firm consisted of ninety partners and sixty-six associates. The firm operates pursuant to a detailed partnership agreement, which, in part, sets forth a partner-withdrawal formula based on the value of receivables and a proportionate share of the firm's capital. No value for goodwill is included. If a partner chooses to withdraw, that partner's interest in the law firm is based on this formula. The agreement also provides for payments to partners on death, retirement and disability. The partnership books and the partners' interests are periodically reviewed and updated.

During trial, the partnership agreement was admitted into evidence, and an expert witness for the husband explained the partner-withdrawal formula. There was no dispute that if the husband left the firm, he would receive $42,442, which represented his share of the receivables plus his share of the capital account. Furthermore, he could not sell his interest because the partnership agreement includes a restrictive buy-sell provision prohibiting such sale.

The expert witness also testified about another method of determining value based on excess earnings, which he suggested as an alternative only if the district court determined that the value of the husband's interest as determined by the partnership agreement was not binding in the dissolution of marriage proceeding.[1] The district court rejected the value of the husband's interest in the partnership based on the partnership agreement, finding that because he had every intention of staying with the firm, the partnership agreement figure ignored "all the present facts and intentions of the parties." The district court determined the value of the husband's interest by using the excess earnings valuation method.

On appeal, the husband argues that the district court erred in concluding that the partnership agreement, which is binding on him and the partnership, was not binding in the marital dissolution proceeding.

## II

There is no dispute that a spouse's interest in a professional partnership is a marital asset subject to division in a dissolution proceeding. However, courts are divided as to the means and methods of determining such interest. In Colorado, the value of goodwill incident to a professional practice has been considered a marital asset.

---

1. The husband was aware that the wife's expert witness would be using the excess earnings method to determine the value of his interest in the law firm. He presented evidence of value based on the excess earnings method only to ensure that if the district court rejected the value mandated by the partnership agreement, that the court would use the proper capitalization rate to reach the correct value under the excess earnings method.

*In re Marriage of Nichols,* 43 Colo.App. 383, 385, 606 P.2d 1314, 1316 (1979).[2]

In a substantial number of jurisdictions, the courts rely on an existing partnership agreement in valuing a partner's interest. *Peddycord v. Peddycord,* 479 N.E.2d 615 (Ind.Ct.App.1985); *Weaver v. Weaver,* 72 N.C.App. 409, 324 S.E.2d 915 (1985); *Hertz v. Hertz,* 99 N.M. 320, 657 P.2d 1169 (1983); *Finn v. Finn,* 658 S.W.2d 735 (Tex.Ct.App. 1983); *Holbrook v. Holbrook,* 103 Wis.2d 327, 309 N.W.2d 343 (Ct.App.1981); *Stern v. Stern,* 66 N.J. 340, 331 A.2d 257 (1975). Some courts find that a partnership agreement presumptively controls the value of a partner's interest, *see Stern v. Stern,* 66 N.J. 340, 331 A.2d 257, 261 (1975), while others find that the agreement absolutely controls. *See Hertz v. Hertz,* 99 N.M. 320, 657 P.2d 1169, 1174 (N.M.1983).

In *Stern,* the New Jersey Supreme Court found that the amount arrived at from application of the law firm's partnership agreement, which provided for a fixed sum intended to reflect the partnership's worth plus the partner's capital account, should be treated as the presumptive value of the husband's interest in the law firm. *Stern,* 331 A.2d at 261. In reflecting on what constitutes the monetary worth of a professional partnership, the court said:

> Generally speaking the monetary worth of this type of professional partnership will consist of the total value of the partners' capital accounts, accounts receivable, the value of work in progress, any appreciation in the true worth of tangible personalty over and above book value, together with good will, should there in fact be any; the total so arrived at to be diminished by the amount of accounts payable as well as any other liabilities not reflected on the partnership books.

*Id.* (footnote omitted). In conclusion the court stated: "Once it is established that the books of the firm are well kept and

that the value of partners' interests are in fact periodically and carefully reviewed, then the presumption to which we have referred should be subject to effective attack only upon the submission of clear and convincing proofs." *Id.*

In *Hertz,* the husband belonged to a law firm which had a stock transfer agreement that included goodwill in the amount of $1.00 among the assets represented by the stock valuation. *Hertz,* 657 P.2d at 1173–74. In determining the value of the husband's interest in the law firm, the district court relied on the stock transfer agreement, but added to that value an amount representing goodwill based upon a capitalization of excess earnings. *Id.* at 1173. The New Mexico Supreme Court found that the district court erred in adding value based on excess earnings because the agreement included a value for goodwill of $1.00. *Id.* at 1174. The court also held that a non-shareholder spouse is bound to the same terms of a shareholder valuation agreement as a shareholder spouse, thus insuring that the non-shareholder spouse does not receive a greater value than that of the shareholder. The court noted that: "There is a disturbing inequity in compelling a professional practitioner to pay a spouse a share of intangible assets at a judicially determined value that could not be realized by a sale or another method of liquidating value." *Id.,* quoting *Holbrook v. Holbrook,* 103 Wis.2d 327, 309 N.W.2d 343, 355 (Ct.App.1981).

The fact that a partnership agreement does not include a value for goodwill does not make it inadequate for purposes of determining a partner's interest for marital distribution. In *Finn v. Finn,* 658 S.W.2d 735 (Tex.Ct.App.1983), the husband was a senior partner in a large Dallas law firm and his interest was determined by a partnership agreement that did not include an amount for goodwill. The court found that a two-pronged test should be used to deter-

---

**2.** This case held that the value of goodwill incident to the husband's dental practice acquired during his marriage was marital property. The dental practice, however, was not a partnership. Furthermore, in its decision, the court of appeals expressly referred to professions where

practices "are *bought and sold.*" *Nichols,* 606 P.2d at 1315 (emphasis added). In contrast, the *Huff* case involves a partnership interest which cannot be bought or sold. In 1980, this court granted certiorari to review *Nichols,* but in 1981 it was dismissed as moot.

mine whether goodwill attached to a professional practice was subject to division upon divorce. *Id.* at 740–41.

First, goodwill must be determined to exist independently of the personal ability of the professional spouse. Second, if such goodwill is found to exist, then it must be determined whether that goodwill has a commercial value in which the community estate is entitled to share. *Id.* at 741.

The law firm was found to have goodwill independent of the husband's professional ability because it conducted business under a name other than that of the senior partners and because it had been providing legal services to the public for more than ninety years. Therefore, the firm's reputation was built, in large part, by the abilities of the husband's predecessors in the firm, as well as the abilities of the present partners. *Id.* The court found that the community estate was not entitled to share in the goodwill of the firm because "[t]he community estate is not entitled to a greater interest than that to which the husband is entitled in the firm's good-will." *Id.* The fact that the husband had no legal right to realize the value of the firm's goodwill was a decisive factor in the court's determination that the value of goodwill was properly precluded from the valuation of the husband's interest in the law firm. *Id.* at 742.

Here, the husband belonged to a well-established law firm which had been in existence for many years and had many partners and associates. The evidence established that the partnership books were kept in accordance with generally accepted accounting principles, the partnership interests were periodically reviewed, and the value of each partner's interest was determined without considering an amount for goodwill. The husband was not entitled to receive any value for goodwill, and it is inequitable for his spouse to receive, as part of marital assets, a value that he could not receive.

Relying on *In re Marriage of Bookout,* 833 P.2d 800, 804–805 (Colo.App.1991), *Dugan v. Dugan,* 92 N.J. 423, 457 A.2d 1, 9 (1983), and *In re Marriage of Hall,* 103 Wash.2d 236, 692 P.2d 175, 179–80 (1984), the majority states that the excess earnings method is a generally accepted method for determining the present value of someone's interest in a business. Maj. op. at 256. This is true where there is no partnership agreement establishing a formula to determine the value. In *Bookout,* the court of appeals found the excess earnings method appropriate to determine the value of the husband's interest in his physical therapy practice, but no partnership agreement was involved. In *Dugan,* the New Jersey Supreme Court adopted the excess earnings approach to evaluate the husband/attorney's goodwill in his exclusively owned professional corporation for purposes of a divorce proceeding. Again, there was no partnership agreement. In *Hall,* the court found that the trial court could consider various methods for valuing goodwill including partnership agreements and the excess earnings method. That case, however, involved a medical practice which could be bought and sold and which consisted of only three shareholders.

Where there is a partnership agreement, and when the partnership interests cannot be bought or sold, I am of the view that the agreement should control with respect to the valuation of an interest in that partnership for property division purposes. The district court should have determined whether the books of the husband's law firm were accurately kept, and whether the value of the partners' interests was periodically reviewed. Once this was established, the value of the husband's interest, as set forth in the partnership agreement, should have been adopted absent clear and convincing evidence that it did not reflect the true value of the interest. Accordingly, I respectfully dissent.