IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 23, 2014 Session

## SUSAN ANNE OGLES v. THOMAS WAYNE OGLES

**Direct Appeal from the Circuit Court for Coffee County**
**No. 3560-D      L. Craig Johnson, Judge**

**No. M2013-02215-COA-R3-CV - Filed January 7, 2015**

This is an appeal from a three-day divorce trial. The trial court classified and valued the parties' assets and divided the marital estate. The court awarded the wife $2,000 per month in transitional alimony for a period of 14 months, and it denied the parties' requests for attorney's fees. The wife appeals, challenging the trial court's classification and valuation of certain assets, the alimony award, and the trial court's decision to deny her request for attorney's fees. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

BRANDON O. GIBSON, J., delivered the opinion of the Court, in which RICHARD H. DINKINS, J., and W. NEAL MCBRAYER, J., joined.

William Andrew Lockhart and Randall W. Morrison, Tullahoma, Tennessee, for the appellant, Susan Anne Ogles.

Roger James Bean, Tullahoma, Tennessee, for the appellee, Thomas Wayne Ogles.

### OPINION

### I. FACTS & PROCEDURAL HISTORY

Susan Anne Ogles ("Wife") and Thomas Wayne Ogles ("Husband") met in June 2001 and married in October 2001, when Wife was 54 years old and Husband was 56. This was the fourth marriage for both parties. When the parties married, Husband owned a cattle business and an 88-acre farm. He also owned a business called Quality Electric Service ("QES"), which he began in 1972. QES employed about six to eight electricians at the time of the marriage. Wife was working as a real estate broker for the Metropolitan Development Housing Agency in Nashville, but she quit her job one year after the parties' marriage,

against Husband's wishes. Thereafter, Wife devoted a few hours a week to helping Husband with QES and the cattle business, but she was not otherwise employed.

After eight years of marriage, the parties separated in June 2010. Wife filed a complaint for divorce, alleging irreconcilable differences and inappropriate marital conduct. Husband filed a counter-complaint for divorce, alleging the same. Wife claimed an interest in the 88-acre farm, the cattle business, and QES, and she sought temporary and permanent alimony and an award of attorney's fees.

The parties entered into an agreed order providing that Wife would live in the marital residence pending the final hearing, and Husband would live in a small guest house on the farm. Husband agreed to pay Wife $500 per week as temporary support until the final hearing, and he was also responsible for paying Wife's health insurance premium, her telephone bill, one-half of the electric bill for the marital residence, the water and gas bill, and the utilities for the farm and the guest house. Wife was responsible for paying the other half of the electric bill for the marital residence.

During the proceedings, the parties sold their cattle for roughly $350,000. By agreement, they used the proceeds to pay various expenses and split the remainder. The parties also agreed that the 88-acre farm was marital property subject to division and was worth $537,000.[1] However, the parties could not agree as to the ownership of QES or its present value. Since the parties married in 2001, QES had expanded considerably. The number of employees had increased from roughly six or eight to about 29. The number of company vehicles increased from four or five to about 15 or 16. Wife asserted that she substantially contributed to the increase in value of QES during the marriage, and therefore, she should be awarded a portion of the increased value as marital property. Husband claimed that Wife did not substantially contribute to the increase in value of QES during the marriage, so the business should remain his separate property.

The divorce trial was held over the course of three days in March and April 2013. By that time, the divorce case had been pending for over two and a half years, and the parties had been married for eleven years. Both parties testified about the assets they accumulated during the marriage, and they disputed whether certain items should be classified as marital or separate property. They described their employment history and monthly expenses as these subjects relate to the issue of alimony. Both parties presented expert testimony

---

[1]The marital residence was constructed on the farm during the marriage. Wife sold a condo in Florida and liquidated two retirement accounts, and the parties used the funds to pay off the construction loan and/or mortgage on the marital home. Husband executed a quitclaim deed and conveyed an interest in the home and farm to Wife.

regarding the value of QES. The trial court also heard testimony from the accountant who prepared the tax returns for QES, the field supervisor at QES, one of the farm hands employed by Husband, and the woman Husband was dating at the time of trial.

On August 1, 2013, the trial court entered a detailed opinion spanning 24 pages, and on November 18, 2013, the court entered an additional order clarifying its rulings on several issues. The court found that "both parties have engaged in conduct that is considered grounds for divorce." The court classified the 88-acre farm as marital property and gave Husband the option of purchasing Wife's one-half interest in the farm for $268,500 or auctioning the property. It noted that the proceeds from the cattle had already been equally divided. The court specifically addressed numerous items of personal property and classified them as separate or marital property. The trial court awarded Wife marital assets valued at $420,034 and awarded Husband marital assets and debts with a net value of $450,262. (These amounts did not include the funds already received from the sale of the cattle or the value of QES.) The court classified QES as Husband's separate property because it was owned prior to the marriage; however, it classified the increase in value of QES during the marriage as marital property subject to division. The court adopted the valuation of QES proposed by Husband's expert and valued the company at $260,000. The court concluded that QES was worth $124,000 when the parties married in 2001. The court found that Husband's contribution to the preservation of QES and its increase in value exceeded the contribution made by Wife during the marriage, so it awarded Husband 60% of the increase in value and awarded Wife 40%. As a result, Husband was required to pay Wife $54,400 for her share of the increased value of QES. The court awarded Wife transitional alimony for 14 months at $2,000 per month. Finally, the court found that both parties contributed to the breakup of the marriage and had the ability to pay their own attorney's fees. Wife timely filed a notice of appeal.

## II. ISSUES PRESENTED

Wife presents the following issues, which we have slightly restated, for review on appeal:

1.      Whether the trial court erred in assigning a value to QES;

2.      Whether the trial court erred in designating certain items of property as marital property rather than Wife's separate property;

3.      Whether the trial court erred by failing to award Wife an interest in certain property acquired by Husband during the pendency of the divorce proceeding;

4.    Whether the trial court erred in the type and amount of alimony awarded to Wife;

5.    Whether the trial court erred in declining to award Wife attorney and expert fees.

For the following reasons, we affirm the decision of the circuit court and remand for further proceedings.

## III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005). When the resolution of issues depends on the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *Mach. Sales Co. v. Diamondcut Forestry Prods., LLC*, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002). "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Id.* We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

### A. Valuing QES

Wife's first contention on appeal is that the trial court erred in assigning a value of $260,000 to QES.[2] As noted above, both parties retained experts to evaluate QES and render an opinion on its present value. Wife's expert was Steve Maggart, a certified public accountant and accredited business valuator who had been employed in the accounting field

---

[2]Husband does not challenge the trial court's decision to classify the increase in value as marital property. Neither party challenges the trial court's decision to divide the increase in value on a 60/40 basis, nor do they challenge the trial court's valuation of QES at $124,000 at the time of the marriage. Accordingly, the only issue on appeal pertaining to QES is regarding its present value.

since 1972. Mr. Maggart testified that there are several methods available for valuing a business such as QES and said that he evaluated QES using several different approaches. First, Mr. Maggart applied the book value method and determined that QES would be valued at $274,000 using that approach. Next, Mr. Maggart applied the asset based method of valuation and determined that QES would be valued at $378,000 under that approach. Mr. Maggart then applied the capitalization of earnings method and several variations of that method using data from a range of years. Using information from a five-year range in his capitalization of earnings calculation, Mr. Maggart reached a value of $853,000. Using information only from 2011, he reached a capitalization of earnings value of $610,000. Using estimated figures for the year 2012, he calculated a value of $880,000. Using the estimated figures for 2012 in the five-year calculation, he got a value of $774,000. Mr. Maggart believed that the capitalization of earnings method was the most appropriate approach for valuing QES but said that the asset value method should also be considered in the analysis. After considering his conclusions from all of these various methods, Mr. Maggart determined that $725,000 was "a fair number" and constituted his final opinion as to the value of QES.

Husband's expert was Gerald LeCroy, who was also a certified public accountant and certified valuation analyst. He had been practicing since 1962. Mr. LeCroy also discussed three fundamental approaches for valuing a business such as QES – a market approach, a net asset approach, and a capitalized earnings approach. Mr. LeCroy determined that the market approach was not an appropriate method for valuing QES. He applied the net asset value method and determined that QES would be valued at $260,000 under that approach. He also used the capitalization of earnings approach and determined that QES would be valued at $245,000 under that method. Mr. LeCroy believed that the asset value approach was the more appropriate method for valuing QES, for numerous reasons. Accordingly, Mr. LeCroy opined that the fair market value of QES was $260,000.

Mr. LeCroy criticized Mr. Maggart's valuation of QES at $725,000 and stated that no reasonable person would buy QES for that amount. Conversely, Mr. Maggart criticized Mr. LeCroy's valuation at $260,000 and said that amount "to me makes no sense."

The trial court accepted Mr. LeCroy's valuation of $260,000 and found that he utilized "the proper and most equitable method" of valuation of the business, for a number of reasons. The trial court credited Mr. LeCroy's testimony "that the adjusted debt-to-asset value of Quality Electric Service was the proper standard to use in that contractors, particularly small ones, are often sold at or near book value because barriers to entry are minimal, causing many to start their own business, rather than purchasing existing contractors." The court also noted Mr. LeCroy's testimony that "the capitalized earnings method assumes a growth rate which is not normally achieved in small contracting businesses

and, more importantly, contains a number of highly subjective estimates of working capital requirements and the risk factors discussed by both expert witnesses." The court found that Wife's expert, Mr. Maggart, "[s]uspectly" valued QES at $725,000, which, the court noted, was $347,000 more than his calculation of the company's net asset value and $465,000 more than Mr. LeCroy's calculation of net asset value. The court discussed Mr. LeCroy's testimony that this amount was attributable to goodwill, which would be based on Husband's earning capacity and not considered a marital asset subject to division. The court also found that Mr. Maggart's valuation "failed to properly reflect the risk to the company of several factors," including the fact that Husband was not bound by a noncompete agreement and the fact that QES performed the vast majority of its work for one customer, a nationwide homebuilder, who could terminate their contract without cause.

When dividing marital property, the trial court "should place a reasonable value on each piece of property subject to division." *Owens v. Owens*, 241 S.W.3d 478, 486 (Tenn. Ct. App. 2007) (citing *Davidson v. Davidson*, No. M2003-01839-COA-R3-CV, 2005 WL 2860270, at *2 (Tenn. Ct. App. Oct. 31, 2005); *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003)). This Court reviews a trial court's valuation of marital property as a question of fact. *Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007). In accordance with Tennessee Rule of Appellate Procedure 13(d), the trial court's valuation of marital property will be presumed to be correct unless the evidence preponderates otherwise. *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). Decisions as to the value of the parties' assets are entitled to great weight on appeal and will not be second-guessed unless they are not supported by a preponderance of the evidence. *Woodward*, 240 S.W.3d at 828. "When a trial court is confronted with conflicting valuation evidence, the court may place a value on the property that is within the range of the values represented by all the relevant valuation evidence." *Id.* (citing *Watters v. Watters*, 959 S.W.2d 585, 589 (Tenn. Ct. App. 1997); *Brock v. Brock*, 941 S.W.2d 896, 902 (Tenn. Ct. App. 1996)); *see also Wallace*, 733 S.W.2d at 107 ("the trial court, in its discretion, is free to place a value on a marital asset that is within the range of the evidence submitted").

"'[T]here are a number of acceptable methods available" to determine the value of a closely held corporation, *Powell v. Powell*, 124 S.W.3d 100, 104 (Tenn. Ct. App. 2003) (quoting *Wallace*, 733 S.W.2d at 107), or in this case, a single-member LLC.[3] Three of these

_____

[3]Where the owners of the LLC are a small group of family members, principles used in valuing closely held corporations are "instructive" and "equally applicable." *Powell*, 124 S.W.3d at 104; *see also Inzer v. Inzer*, No. M2008-00222-COA-R3-CV, 2009 WL 2263818, at *4 (Tenn. Ct. App. July 28, 2009) (explaining that an LLC is "a type of entity that is akin to a closely held corporation for purposes of valuing it as a marital asset").

methods are the market value method, the asset value method, and the earnings value or capitalization of earnings method, but "[t]here are still others," such as the dividend method and the liquidating value method. *Wallace*, 733 S.W.2d at 107 (citing B. Goldberg, *Valuation of Divorce Assets* §§ 6.5-6.8 (1984)). "The choice of the proper method or combination of methods" depends on the unique circumstances of each case. *Id.* "The courts have not articulated a consistent approach to the valuation of this type of marital asset." *Id.* "Since valuation evidence is inherently subjective, a trial court's valuation decisions need not coincide precisely with the valuation opinions offered into evidence." *Owens*, 241 S.W.3d at 489 (citing *Waits v. Waits*, No. 01A01-9207-CV-00288, 1993 WL 49564, at *3 (Tenn. Ct. App. Feb. 26, 1993)). Determining the value of these companies "is not an exact science." *Wallace*, 733 S.W.2d at 107. "It can be a difficult exercise for any court." *Edenfield v. Edenfield*, No. E2004-00929-COA-R3-CV, 2005 WL 2860289, at *8 (Tenn. Ct. App. Oct. 31, 2005). Again, "trial courts have wide latitude in determining the value of the marital estate," and "this discretion extends to choosing the method for valuation of a closely held corporation." *Watson v. Watson*, No. W2004-01014-COA-R3-CV, 2005 WL 1882413, at *9 (Tenn. Ct. App. Aug. 9, 2005) (citing *Irvine v. Irvine*, No. 03A01-9304-CH-00168, 1993 WL 444584 (Tenn. Ct. App. Nov. 3, 1993)).

Wife argues that the trial court erred in concluding that the excess value reflected by Mr. Maggart's capitalization of earnings calculation was goodwill that would not be considered a marital asset because, Wife claims, "there was little evidence that the goodwill was directly attributable to [Husband]" as opposed to QES. We disagree with this assertion and find that the weight of the evidence demonstrated that the goodwill was more attributable to Husband personally than to QES. In Tennessee, the goodwill of a business, "dependent as it is on the person and personality of the spouse practicing the profession, is not a part of the marital estate." *Kerce v. Kerce*, No. M2002-01744-COA-R3-CV, 2003 WL 22037526, at *4 (Tenn. Ct. App. Aug. 29, 2003) (citing *Smith v. Smith*, 709 S.W.2d 588 (Tenn. Ct. App. 1985); *Hazard v. Hazard*, 833 S.W.2d 911 (Tenn. Ct. App. 1991); *Enoch v. Enoch*, 1987 WL 12042 (Tenn. Ct. App. June 10, 1987)).

> The concept of professional good will evanesces when one attempts to distinguish it from future earning capacity.
> . . . .
> There is a disturbing inequity in compelling a professional practitioner to pay a spouse a share of intangible assets at a judicially determined value that could not be realized by a sale or another method of liquidating value.

*Smith*, 709 S.W.2d at 591-92 (quoting *Holbrook v. Holbrook*, 309 N.W.2d 343, 354-55 (Wis. Ct. App. 1981)). Wife argues that the trial court should have assigned a specific value to the amount of goodwill attributable to Husband and the amount attributable to QES. However,

Wife did not present any evidence to that effect or ask the trial court to make such a determination. Wife's own expert could not really explain why his capitalization of income approach yielded a value $350,000 higher than his asset value approach. When asked whether the difference between the two figures represented an intangible asset such as goodwill, Mr. Maggart said, "I haven't tried to isolate any kind of intangibles. If you want to do that then you've got to go through another whole sophisticated calculation." Wife's attorney asked Mr. Maggart to estimate the percentage of goodwill attributable to Husband personally and that attributable to the enterprise. Mr. Maggart responded, "I can't do that. I haven't tried to do that and I don't know how to do that." Because Wife did not present any evidence of the matters she contends the trial court should have found, we find no merit in this argument on appeal. *See Ramsey v. Ramsey*, No. E2012-01940-COA-R3-CV, 2013 WL 5827648, at *4 (Tenn. Ct. App. Oct. 29, 2013) (*no perm. app. filed*) (stating that the burden is on the parties to produce competent evidence of the value of a marital asset, "and the parties are bound by the evidence they present"). However, we note that even Mr. Maggart appeared to recognize that the difference between the experts' values was goodwill attributable to Husband personally. When explaining the difference between his value and Mr. LeCroy's value, Mr. Maggart stated:

> [I]f you assume that the business is going to keep going *and he's going to stay there* and is going to continue to generate the earnings that it's been generating then you've got a value of $725,000 as a reasonable number.
>
> If, on the other hand, you make the assumption that *he's not going to be there*, that he is going to leave and he's going to go across the street and try to take all the business of the company with him then the $260,000 would make more sense because all that's left is the assets of the company.

(Emphasis added.)

In the case before us, the evidence does not preponderate against the trial court's finding that the present value of QES is $260,000. The asset value approach utilized by Mr. LeCroy and adopted by the trial court is accepted by Tennessee courts as a competent method of determining the value of an LLC for the purpose of equitably distributing marital assets in a divorce proceeding.[4] The reasons given by Mr. LeCroy for adopting this valuation method are persuasive. Because the trial court placed a value on QES within the range of values presented by competent evidence, we decline to second-guess the trial court's decision. *See Owens*, 241 S.W.3d at 489.

---

[4]We find no support for Wife's argument that the trial court placed too much emphasis on Revenue Ruling 59-60. "Although not bound by it, Tennessee courts suggest Revenue Ruling 59-60 provides standard guidelines to value such a business." *Inzer*, 2009 WL 2263818, at *6.

### B. Classification of Items as Marital or Separate Property

Next, Wife contends that the trial court erred in designating certain items of property as marital property rather than Wife's separate property. Wife claims that the items at issue were gifts to her, and therefore, they should not have been included in the marital estate.

Questions regarding the classification of property as either marital or separate are "inherently factual." *Owens*, 241 S.W.3d at 485. Appellate courts "give considerable deference to the trial court's factual finding regarding the proper classification of an asset." *Gaither v. Gaither*, No. E2013-02681-COA-R3-CV, 2014 WL 5112797, at *5 (Tenn. Ct. App. Oct. 13, 2014) (*no perm. app. filed*). The trial court is vested with wide discretion in its classification of property, and its decision in that regard is given great weight on appeal. *McKin v. McKin*, No. E2010-01061-COA-R3-CV, 2011 WL 529287, at *3 (Tenn. Ct. App. Feb. 14, 2011); *Dunlap v. Dunlap*, 996 S.W.2d 803, 814 (Tenn. Ct. App. 1998)).

In Tennessee, assets acquired by either spouse during the marriage are presumed to be marital property, and the party desiring to dispute this classification has the burden of proving by a preponderance of the evidence that the disputed asset is separate property. *Gaither*, 2014 WL 5112797, at *4 (citing *Owens*, 241 S.W.3d at 485). "Thus, the classification of all assets acquired by either spouse during the marriage begins with the presumption that the asset is marital." *Owens*, 241 S.W.3d at 485. "Separate property" includes "[p]roperty acquired by a spouse at any time by gift, bequest, devise or descent." Tenn. Code Ann. § 36-4-121(b)(2)(D). Accordingly, "[a] gift from one spouse to another during the marriage is considered the donee spouse's separate property." *Gaither*, 2014 WL 5112797, at *5 (citing *Denton v. Denton*, 33 S.W.3d 229, 233 (Tenn. Ct. App. 2000); *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1989)). The burden of proving that a gift was made is on the donee or the party asserting the gift. *Dunlap*, 996 S.W.2d at 814 (citing *Hansel v. Hansel*, 939 S.W.2d 110, 112 (Tenn. Ct. App. 1996); *Hartman v. Hartman*, No. 03A01-9608-CV-00249, 1997 WL 176701, at *2 (Tenn. Ct. App. Apr. 10, 1997)). In order to meet this burden, the donee must establish "'intention by the donor to make a present gift'" coupled with delivery of the gift. *Id.* at 815 (quoting *Hansel*, 939 S.W.2d at 112).

### 1. The Cadillac Escalade

The first asset Wife asserts is her separate property is a 2003 Cadillac Escalade. Wife testified that she considered this vehicle her separate property because Husband gave it to her as a Christmas gift with "a big red bow on it." Wife testified that the parties considered the Escalade "my truck," but Husband testified that it was "ours." Husband testified that the Escalade was not a Christmas gift to Wife and that it was purchased by QES in mid-December for tax purposes. He testified that there was a tv commercial running at that time

that showed a vehicle with a red bow on it, and Wife suggested that they put a bow on the Escalade when her family came to visit for Christmas. He said they did and "had some good laughs out of it." However, Husband insisted that the vehicle was not a gift to Wife. Wife concedes that the Escalade was purchased with a check drawn on the QES account, and QES paid the insurance and tags for the vehicle. The Escalade was carried on the books of QES and depreciated as a company asset. The Escalade was included in the business valuations of QES performed by both experts. The trial court found that the Escalade was the property of QES rather than Wife's separate property. The evidence does not preponderate against this finding.

### 2. The Ford Ranger

Wife testified that a 2002 Ford Ranger pickup truck was her separate property as well. She testified that she told Husband during the marriage that she wanted a little pickup truck that she could use to drive around the farm, and Husband bought her the Ranger. When asked if the Ranger was presented as a gift, Wife said it was. Husband denied that Wife asked him to buy the truck. He testified that the Ranger was not a gift to Wife and that he used it just as much as she did. The Ranger was purchased by QES, and QES maintained the tags and insurance on the vehicle. Again, both experts included this vehicle in their business valuation of QES. Based on the evidence presented, we conclude that the trial court did not err in its classification of the Ranger as property belonging to QES rather than as Wife's separate property.

### 3. The John Deere Gator

Wife testified that she told Husband she wanted her "very own" Gator to use on the farm, and Husband bought her one during the marriage. She said the parties considered it hers but admitted that Husband also used it. Husband testified that the Gator was purchased "for the farm" by the parties' cattle business. Husband denied that Wife asked him to purchase the Gator and denied that it was a gift to her. This evidence is sufficient to support the trial court's decision to classify the gator as marital property.

### 4. Jewelry

Finally, Wife disputes the trial court's classification of two pieces of jewelry – a 10-carat diamond necklace that cost approximately $10,000 and a pair of diamond earrings worth $5,000. Wife claimed that these items were gifts to her. She admitted that she purchased the necklace herself and wrote the check for it herself; however, she claimed that Husband told her to pick it out for her birthday. Husband adamantly denied this. He claimed that Wife became angry because he purchased a $20,000 cow for the farm, so she said she

was going to buy a necklace. Wife admitted that she purchased the necklace after the parties' discussion about the cow. She claimed the parties agreed that Husband could buy the cow "and that I could go and buy the diamond necklace on my birthday, which I did. It was right at my birthday. I had been shopping for it." Husband denied the necklace was a gift and said there was nothing he could do to stop Wife from buying the necklace for herself. As for the earrings, Husband testified that they were not a gift from him and that he had no idea where Wife bought them. Again, we find that the evidence does not preponderate against the trial court's classification of these assets as marital property.

## C. Cattle

Wife also argues that the trial court should have included in the marital estate two cows allegedly acquired by Husband during the divorce proceeding. After the parties sold the cattle they owned jointly and during the pendency of the divorce, Husband purchased several additional cattle. The trial court classified the cattle purchased by Husband during the pendency of the divorce as marital property and accounted for them in its division of property. However, Wife argues that the trial court failed to account for two cows that Husband allegedly owned. At trial, Wife introduced photographs from a cattle show depicting Husband and several other individuals standing beside the two cows. She also obtained insurance documents reflecting that Husband maintained an insurance policy on one-half of the value of these cows.

Wife confronted Husband about whether he owned the two cows, but Husband denied any ownership interest in them. He did admit that one of the cows, Sheza Bonnie, was named after his current girlfriend. Husband told Wife that the cows belonged to another individual, Mr. Cooper, who owned a cattle farm in Georgia. Wife admitted at trial that the two cows were registered to Mr. Cooper and/or his children. Mr. Cooper was also deposed, and he testified about certain cattle that he and Husband owned as partners, but he did not mention the two cows at issue. Husband's girlfriend testified that she visited Mr. Cooper's cattle farm in Georgia with Husband and said that the Coopers named a calf after her while she was there.

At trial, Husband testified that the two cows are "daughter[s]" of the "mama" cow he owns, and if they win cattle shows it will make his cow more valuable. Husband said he had an agreement with Mr. Cooper, whereby Husband would pay half of the show expenses for the cows, and Husband would receive a heifer calf and a "flush"[5] if the animals won. Thus, Husband said that he had a lot to lose if something happened to one of the animals. Husband said he was unable to purchase a policy of insurance on the life of the unborn heifer, but he could insure the lives of the two cows being shown in order to protect his investment in the show expenses. The trial judge must have believed Husband's explanation because he did

---

[5]A "flush" is the removal of an embryo in a cattle breeding operation.

not include the two disputed cows in the marital estate.  Giving due deference to the trial court's ability to gauge the parties' credibility, we find no error in this decision.

## D.  Alimony

Having addressed the disputes as to marital property, we now move to the issue of alimony.  As previously noted, the trial court awarded Wife $2,000 per month in transitional alimony for a period of 14 months.  Wife argues that the trial court should have awarded her a greater monthly sum of alimony in the form of long-term alimony in futuro.

The Tennessee Supreme Court set forth the standard that applies to our review of an alimony decision in *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011):

> For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. *See Robinson v. Robinson*, 26 Tenn. (7 Hum.) 440, 443 (1846) ("Upon a divorce ... the wife is entitled to a fair portion of her husband's estate for her support, and the amount thus to be appropriated is a matter within the legal discretion of the chancellor. . . ."). This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award. *See, e.g., Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004); *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).

> Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew*, 40 S.W.3d at 470; *Robertson v. Robertson*, 76 S.W.3d 337, 340-41 (Tenn. 2002).  As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234.  Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343.  An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous

assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

*Id.* at 105-106.

There are several distinct types of alimony available under Tennessee law. Alimony in futuro, also known as periodic alimony, is intended to provide support on a long term basis or until the death or remarriage of the recipient. *Gonsewski*, 350 S.W.3d at 107 (citing Tenn. Code Ann. § 36-5-121(f)(1)). However, the alimony statute reflects a legislative preference favoring short-term spousal support over long-term spousal support. *Id.* at 106 (citing Tenn. Code Ann. § 36-5-121(d)(2)-(3)). Transitional alimony is a form of short-term support. *Id.* at 109. Transitional alimony is appropriate "when a court finds that rehabilitation is not required but that the economically disadvantaged spouse needs financial assistance in adjusting to the economic consequences of the divorce." *Id.* (citing Tenn. Code Ann. § 36-5-121(d)(4), (g)(1); *Riggs v. Riggs*, 250 S.W.3d 453, 456 n.5 (Tenn. Ct. App. 2007). "Simply put, this type of alimony 'aid[s] the person in the transition to the status of a single person.'" *Id.* (quoting *Mills v. Mills*, No. M2009-02474-COA-R3-CV, 2010 WL 3059170, at *5 (Tenn. Ct. App. Aug. 4, 2010)); *see also Montgomery v. Silberman*, No. M2009-00853-COA-R3-CV, 2009 WL 4113669, at *2 (Tenn. Ct. App. Nov. 24, 2009) (affirming an award of transitional alimony to a wife "to bridge the gap, so to speak, between her married life and single life").

In contrast to rehabilitative alimony, which is designed to increase an economically disadvantaged spouse's capacity for self-sufficiency, transitional alimony is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income.

-13-

*Gonsewski*, 350 S.W.3d at 109.

When deciding whether to award spousal support and, if so, determining the nature, amount, length, and manner of payment, courts consider several factors, which are listed in Tennessee Code Annotated section 36-5-121(i):

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

The most important factors are "the disadvantaged spouse's need and the obligor spouse's ability to pay." *Gonsewski*, 350 S.W.3d at 110. Applying the foregoing principles to the case at bar, we do not find that the trial court abused its discretion by awarding Wife $2,000 per month in transitional alimony for 14 months.

-14-

When the divorce decree was entered, Husband was 68 years old, and Wife was 66. Husband had a high school education and a few months of vocational school training; Wife had a high school education and about two years of college education. When the parties met in 2001, Wife was 54 years old and working in Nashville as a real estate broker for a Metro housing agency for somewhere between $20 and $25 an hour. She was in the process of divorcing her third husband and planned to move to Florida, obtain her real estate license there, and continue selling real estate. Wife had worked for various realtors in the past and was also employed as an assistant account executive and customer service supervisor at Murray of Ohio. One year after the parties married, Wife quit her job with Metro, even though Husband asked her not to quit working. Since 2002, Wife had not been employed aside from her involvement with QES and the parties' cattle business. However, she maintained her real estate broker's license in retired status. Wife testified that she had not checked to see what steps would be necessary to take her license out of retired status, but she testified that before she quit work in 2002, she was "grandfathered" so she was not required to take continuing education courses. Wife testified at trial that she had not taken any steps toward getting a job since the divorce complaint was filed over two and a half years earlier. When Wife was asked if she had any intention of working, she replied, "Well, I'm 66 years old, [counsel]." Wife testified that she did not believe that she could be gainfully employed at this point in her life. Wife acknowledged that Husband was two years older than she was and that he continued to work even though he suffered from a heart condition. Wife admitted she was contacted by someone about an opportunity to work as a broker for a new company, and she told them she was retired. She testified she did not think she "could go through all that physically." Wife testified that she suffered from osteoporosis, arthritis, and degenerative disc disease, among other things, and said she tired easily and had difficulty standing for long periods. She acknowledged, though, that her profile on a dating website said she did not feel or act her age and that she enjoyed dancing, walking, hiking, and exercising three to four times per week. The trial court found that "[Wife] has not shown that she has any health or other conditions which would prevent her from working, and there is no reason for her not to work outside of the home." The evidence does not preponderate against this finding.

The trial court found that Husband's net income from the cattle business and QES in 2011 was $93,125. It found that Husband's estimated net income for 2012 was approximately $55,000, or $4,666 per month. Husband estimated his expenses at $4,633 per month. At the time of trial, Wife was drawing $1,244 per month from social security and approximately $83 per month from a retirement account. The trial court found that Wife was earning about $40,000 a year, or $3,333 per month, when she was employed with Metro and that she could pull her license out of retirement status "and continue to earn a living." The trial court found that Wife listed $4,460 in monthly expenses, but it noted that she was not actually paying some of the expenses she listed, such as medical or dental insurance, property

insurance, or $1,500 in rent. The court also noted that Wife's expenses included $300 per month for clothing, $150 for her hairdresser, and $150 for entertainment. The trial court found that Wife was receiving liquid assets of approximately $360,000 from the parties' real estate and cattle, not to mention the funds she would receive for her share of QES. The court noted that Wife was younger than Husband and had more education, and the marriage was of a relatively short duration, in addition to the fact that both parties had been married several times previously. The court also mentioned that Husband had been paying Wife temporary support since the parties separated over two and a half years earlier, and Husband had paid over $75,000 to Wife during that time in the form of $500 weekly payments and payment of virtually all of Wife's expenses. Considering all these factors, the trial court awarded Wife $2,000 in transitional alimony for a period of 14 months.

We reject Wife's assertion that the facts of this case support an award of alimony in futuro. Again, "there is a statutory bias toward awarding transitional or rehabilitative alimony over alimony in solido or in futuro." *Gonsewski*, 350 S.W.3d at 109. Given the age of the parties, their education, their employment history, the division of marital property, the duration of the marriage, the parties' relative contributions to the marriage and their businesses, and the absence of minor children or a physical condition that would prevent Wife from working, we are not inclined to second-guess the trial court's decision not to award alimony in futuro. Wife does not specify an amount of alimony that she believes the trial court should have awarded but simply argues that the court erred in the "amount of alimony awarded." We find no abuse of discretion in the trial court's decision to award $2,000 per month.

Finally, Wife argues that the trial court abused its discretion by considering the spousal support that she received during the divorce proceeding as one of the factors relevant to its alimony award. Wife relies on *Scarbrough v. Scarbrough*, No. W1998-00167-COA-R3-CV, 1999 WL 1567097, at *2 (Tenn. Ct. App. Dec. 14, 1999). In that case, a husband argued on appeal that he was entitled to a credit against his alimony obligation for alimony he paid during the divorce proceeding. This Court rejected his argument, stating,

> We disagree with Husband's argument that he should receive credit for alimony previously paid by him. The payments were intended to support Wife until the time that the divorce became final. *Pendente lite* awards are not deducted from permanent alimony awards.

*Id.* at *5.

Here, the trial court did not deduct the pendente lite support from Husband's alimony obligation. The court simply noted when considering the issue of alimony that Husband had

been paying Wife $500 per week, and most of her expenses, for 29 months while the divorce case was pending, and Wife did not work during that time period, even though there was no reason for Wife not to work outside the home. By statute, the court in awarding alimony is authorized to weigh such factors "as are necessary to consider the equities between the parties." Tenn. Code Ann. § 36-5-121(i)(12). We find it was appropriate for the trial court to consider the fact that Husband paid $75,000 in temporary support to Wife during the lengthy divorce proceeding while she refused to work or even begin the process of searching for a job. The trial court's alimony award is affirmed.

### E. Attorney's Fees

Finally, Wife argues that the trial court erred in declining to award her attorney and expert fees. The trial court ordered both parties to pay their own attorney's fees because both parties contributed to the breakup of the marriage, and both parties had "sufficient assets and [the] ability to pay" their own fees.

The supreme court in *Gonsewski* set forth the following principles that guide our review of the trial court's decision on attorney's fees:

> It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido. *See* Tenn. Code Ann. § 36-5-121(h)(1) ("alimony in solido may include attorney fees, where appropriate"); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). The decision whether to award attorney's fees is within the sound discretion of the trial court. *Crabtree*, 16 S.W.3d at 361; *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995). As with any alimony award, in deciding whether to award attorney's fees as alimony in solido, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36-5-121(i). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997). Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, see *Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), or the spouse would be required to deplete his or her resources in order to pay them, see *Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980). Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony. *See id.* at 185.

*Gonsewski*, 350 S.W.3d at 113. Considering the trial court's express findings regarding the parties' ability to pay their own attorney's fees and their contribution to the demise of the marriage, we find no abuse of discretion in the court's decision to require both parties to pay their own attorney's fees. Wife does not cite any authority to support her request for expert witness fees. We affirm the trial court's decision to deny Wife's request for Husband to pay such fees.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court and remand for further proceedings. Costs of this appeal are taxed to the appellant, Susan Anne Ogles, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE